**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

OBA CHANDLER,

       Petitioner,

-vs-                                    Case No.  8:03-cv-1347-T-30TGW

JAMES V. CROSBY, JR., et al.,

       Respondents.

_____

## ORDER

      This cause is before the Court on Petitioner Oba Chandler's Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. §2254 and memorandum in support of thereof (Dkts. 1 and 16, respectively), Respondent's response to the petition (Dkt. 17), and Chandler's reply to the response (Dkt. 23).  Chandler is a Florida prisoner under sentence of death challenging three convictions for first degree murder entered by the Sixth Judicial Circuit Court, Pinellas County, Florida.

      A review of the petition, the response, the reply, and the record in light of the applicable statutes and controlling case law demonstrates that Chandler's petition for writ of habeas corpus must be **DENIED.**

### Facts and Procedural History

      On November 10, 1992, Chandler was arrested and charged by indictment with the 1989 murders of Joan Rogers and her two daughters, Michelle and Christe (Dkt. 19, App. A, Vol. 1 at 1).  The indictment alleged that the murders occurred in Pinellas County and Hillsborough County, Florida.  *Id.*  Initially, the Sixth Judicial Circuit Public Defender was appointed to represent Chandler.  *Id.* at 13.  Citing an ethical conflict as cause, the public

defender moved to withdraw on March 3, 1993. *Id.* at 84.  The trial court granted the

motion to withdraw, and on March 10, 1993, Attorney Thomas B. McCoun was appointed

to represent Chandler. *Id.* at 85.  Upon being selected to serve as a Federal magistrate

judge for the United States District Court for the Middle District of Florida, Attorney McCoun

moved for leave to withdraw once new counsel was appointed and the final transfer of

various documents was accomplished (Dkt. 19, App. A, Vol. 6 at 691).  The trial court

granted Attorney McCoun's motion on October 5, 1993, and appointed Attorney Fred

Zinober (hereinafter "Zinober") as lead counsel and Attorneys Robert Santa Lucia, Andrew

Salzman, and Evan Berlin as co-counsel to assist Zinober. *See id.* at 796.

Although initially Chandler elected to be tried in Hillsborough County, *see* Dkt. 19,

App. A, Vol. 5 at 621-22, as discussed *infra*, the parties reached an agreement pursuant

to Fla. Stat. § 910.03(1) (1993) to conduct the trial in Pinellas County where a jury picked

from Orange County would be sequestered.

Represented by Zinober, Chandler proceeded to a trial by jury on September 19,

1994.  In its order affirming Chandler's conviction and sentence on direct appeal, the

Florida Supreme Court summarized the facts as follows:

> The record reflects that the body of Joan Rogers and those of her two
> daughters, Michelle and Christe, were discovered floating in Tampa Bay on
> June 4, 1989.  Each body was nude from the waist down.   Joan's hands
> were tied behind her back, her ankles were tied together, and the yellow rope
> around her neck was attached to a concrete block.   Christe's hands and
> ankles were similarly tied, and she had duct tape on her face or head and a
> rope around her neck.  Michelle's left hand was free with only a loop of rope
> attached, her ankles were bound, she had duct tape on her face or head, and
> the rope around her neck was attached to a concrete block.
>
> The assistant medical examiner, Dr. Edward Corcoran, performed autopsies
> that same day.  He determined that the cause of death for each victim was
> either asphyxiation due to strangulation from the ropes tied around their
> necks or drowning.

The Rogers family was vacationing in Florida and had checked into a Days Inn in Tampa on June 1. One week later, housekeepers notified the general manager that the Rogers' room had not been inhabited for several days. The general manager contacted the police, who secured the room and obtained the hotel's records for the room.  The police subsequently found the Rogers' car parked at a boat ramp on the Courtney Campbell Causeway.

Among the items recovered from the car was a handwritten note on Days Inn stationery and a Clearwater Beach brochure.   The note read, "Turn right. West W on 60, two and one-half miles before the bridge on the right side at light, blue w/wht."  FBI agent James Mathis determined that the handwriting was that of Joan Rogers.  Theresa Stubbs from FDLE determined that some of the handwriting on the Clearwater Beach brochure was Chandler's, while other writing may have been Joan Rogers'.   Samuel McMullin, a fingerprint expert for the Hillsborough County Sheriff's Department, found Chandler's palm print on the brochure.

Rollins Cooper worked as a subcontractor for Chandler at the time of the murders. He testified at trial that on June 1, Chandler appeared to be in a big hurry after bringing Cooper some screen. When asked why, Chandler told Cooper that he had a date with three women. Cooper met Chandler the next morning at 7:05 a.m.; when asked why he looked grubby, Chandler replied that he had been out on his boat all night.

Judy Blair and her friend, Barbara Mottram, both Canadian tourists, testified regarding Chandler's rape of Blair several weeks prior to the Rogers' murders.[1] After meeting the women at a convenience store, Chandler, who identified himself as "Dave," arranged to take them out on his boat the next day. The following morning, May 15, 1989, Mottram decided not to go out on Chandler's boat, so Blair met Chandler alone. Blair testified that Chandler seemed disappointed when told Mottram would not be joining them. After boating for several hours, Blair and Chandler returned to the dock. Chandler asked Blair to get Mottram to join them for an after-dinner boat trip.

Again, Blair could not convince Mottram to join them. Blair testified that Chandler seemed "ticked off" when she told him Mottram would not be joining them. Subsequently, Chandler began making advances to Blair after the boat entered the Gulf of Mexico. Despite Blair's refusals and attempts to resist him, Chandler raped her. Chandler and Blair then returned to shore. The next day, Blair told Mottram what happened and reported the rape to the police. At trial, she identified the clothing Chandler had been wearing that night. Mottram picked Chandler's photograph out of a photo pack and identified him in a lineup and in court.

---

[1]Hereinafter the "Madeira Beach rape."

Chandler visited his daughter, Kristal Mays, and her husband Rick in Cincinnati in November 1989. Kristal later testified that Chandler told her he could not go back to Florida because the police were looking for him for killing some women. While Chandler never admitted to the killings, Kristal testified that he likewise never claimed innocence. Similarly, Rick Mays thought Chandler had committed the murders from the way he described how the police were looking for him as a murder suspect.

During another visit to Cincinnati in October 1990, Chandler had Rick Mays set up a drug deal. Before absconding with some of the drug dealers' money, Chandler put a gun to Rick's head and said, "Family don't mean s___ to me." After Chandler fled, Rick was badly beaten up and almost killed. The Mays' house was also damaged by the drug dealers. This series of incidents forced Kristal Mays to drop out of nursing school. She was upset and told Rick to call the police and report that Chandler "put a gun on him."

After Chandler was arrested in September 1992, Kristal was contacted and cooperated with the police and she began to tape their conversations. She gave a sworn statement to the state attorney's office on October 6, 1992. Kristal had been convicted of a crime involving dishonesty and appeared on the television show *Hard Copy* in 1994 to discuss her father's alleged role in the murders in return for a $1000 fee.

Robert Carlton testified that he bought a blue and white boat from Chandler in July or August 1989. Carlton recalled seeing concrete blocks at the Chandler house and that some of the concrete blocks had three holes and some had two.

Arthur Wayne Stephenson shared a cell with Chandler for ten days in late October 1992. He testified at trial that after viewing television reports about the recovery of the victims' bodies from Tampa Bay, Chandler said that he had met the three women and given them directions to a boat ramp on the Courtney Campbell Causeway. Chandler told Stephenson that one of the girls was very attractive.

Blake Leslie, an inmate at the Pinellas County Jail with Chandler in the fall of 1992, testified that Chandler told him that he took a young lady from another country for a ride in his boat. Her friend did not want to go. Once he got out twenty to thirty miles, Chandler told her to have sex with him or swim for it. Chandler allegedly said that the only reason that woman was still around is because somebody was waiting for her at the boat dock. Leslie, who had been convicted of nine felonies, never heard Chandler speak of murders, only rapes.

Several marine operators for GTE testified to collect calls made from a caller identifying himself as Oba, Obey, Obie, or no personal name and his boat as Gypsy or Gypsy One, from March 17 to June 2, 1989. The calls were placed

to a number registered to Debra Chandler, Chandler's wife. One of the operators, Elizabeth Beiro, testified that she received three collect calls for Debra Chandler's telephone number, at 1:12 and 1:30 a.m. on June 2, 1989. The caller did not give a first name, although he identified his boat as Gypsy One. Later that same morning, at 9:52 a.m., Frances Watkins received a collect call from Gypsy One; the caller identified himself as Obie.

Chandler testified that he met Michelle Rogers when he stopped at a gas station. He testified that he had a very brief conversation with Michelle, giving her directions to the Days Inn on Highway 60. Chandler maintained that he never saw any of the Rogers family again after this short encounter and adamantly denied killing them. He also testified that he never told Rollins Cooper that he had a date with three women. Chandler claimed that he was out on his boat all night because his engine died after a hose burst, spilling all of his fuel. He testified that two men in a boat gave him a tow to Gandy Bridge Marina, where he put some fuel in his boat. In rebuttal, James Hensley, a certified boat mechanic, testified that Chandler's fuel line was possibly still the original, was in good shape, and showed no signs of repair. Hensley stated that even if there had been a hole in the fuel line, it would not have leaked because of the anti-syphoning valve.

When asked about details surrounding the rape of Judy Blair, Chandler invoked his Fifth Amendment right to remain silent twenty-one times, although he did answer some questions regarding his perception of the link between the rape and the murders.

After the jury trial concluded, Chandler was found guilty of all three counts of murder on September 29, 1994. The jury reconvened for the penalty phase the next day. During the penalty phase, Chandler waived the presentation of any testimonial mitigating evidence. However, he did present some documentary evidence, including records showing that he obtained his high school equivalency diploma and earned college credits while in prison. The State presented the judgments and sentences of Chandler's prior armed robberies. The robbery victims also testified about the details of those crimes.

*Chandler v. State*, 702 So.2d 186, 189-91 (Fla. 1997) (footnotes omitted) (hereinafter

*Chandler I)*.

Following the penalty phase of the trial, the jury recommended death for each

murder by a vote of 12-0 (Dkt. 19, App. A, Vol. 66 at 11131-33). The trial court followed

the jury's recommendation and sentenced Chandler to death on November 4, 1994.

The following seven issues were raised on direct appeal:  (1) the trial court violated Chandler's constitutional right to a fair trial by admitting evidence that he sexually battered Judy Blair;  (2) the trial court erred in requiring Chandler to repeatedly invoke his right to remain silent when questioned regarding the facts of the prior sexual battery during cross-examination;  (3) the trial court erred in allowing the State to present a prior consistent statement by Kristal Mays;  (4) the prosecutor's closing argument violated Chandler's right to a fair trial;  (5) the trial court erred in accepting Chandler's waiver of his right to present mitigating testimony during the penalty phase;  (6) the trial court erred in rejecting Chandler's claim of childhood trauma as a mitigating circumstance;  and (7) the standard jury instruction for the heinous, atrocious, or cruel aggravating circumstance is unconstitutionally vague (Dkt. 19, App. A, Vol. 103 at 70-73).  The Florida Supreme Court affirmed Chandler's judgments and sentences on December 11, 1997.  *See Chandler I*, 702 So.2d at 186.  The United States Supreme Court denied Chandler's petition for certiorari review on April 20, 1998.  *See Chandler v. Florida,* 523 U.S. 1083 (1998).

Chandler was originally represented in his efforts to secure collateral relief by the Office of Capital Collateral Regional Counsel, Middle District of Florida.  To toll the one-year limitation period applicable to petitions for federal habeas relief, *see* 28 U.S.C. § 2244(d), Chandler filed a "shell" motion to vacate in state court pursuant to Fla. R. Crim. P. 3.850 on June 17, 1998, setting forth 32 claims for relief (Dkt. 19, App.. C, Vol. 1 at 1; Vol. 2 at 375).  On May 30, 2000, following a substitution of counsel, *see* Dkt. 19, App.. C, Vol. 2 at 357-58, Chandler filed an amended Rule 3.850 motion asserting only that he was denied his Sixth Amendment right to effective assistance of counsel during the guilt phase of his trial, citing Zinober's failure to:  (1) prevent the prosecutor from making improper, prejudicial comments to the jury during closing statements;  (2) protect Chandler's right to a fair and

impartial jury by moving to prevent the selection of the jury from the Orange County venire pool; (3) protect Chandler from the effects of the evidence of a similar crime admitted pursuant to Fla. Stat. 90.404(2)(a) (hereinafter the "*Williams* Rule")[2]; (4) prevent the prosecutor from cross-examining Chandler about the Madeira Beach case; (5) investigate and present available exculpatory evidence that would have supported Chandler's contention that someone other than himself, to wit, John Rogers, committed the murders; (6) investigate and present an expert witness to rebut the State's expert witness on boat fuel lines; and (7) prevent the prosecutor from eliciting testimony from a defense witness that Chandler was being investigated for crimes other than the Madeira Beach rape and the Rogers murders  (Dkt. 19, App. C, Vol. 3 at 415-75).  During a *Huff* hearing[3] held on September 15, 2000, post-conviction counsel conceded that no evidentiary hearing was needed on claims one, five, and seven raised in Chandler's Rule 3.850 motion and abandoned claim six regarding the fuel line expert, announcing that he had investigated the claim very carefully and could find no good faith basis therefor. Following an evidentiary hearing, the trial court entered an order denying the motion on June 27, 2001 (Dkt. 19, App. C, Vol. 11 at 2054). Chandler appealed the trial court's decision to the Florida Supreme Court, raising the following claims:

---

[2]The *Williams* Rule, codified in Fla. Stat. § 90.404, is substantially similar to Federal Rule of Evidence 404. Under Fla. Stat. § 90.404(2), evidence of other crimes, wrongs, or acts is admissible when relevant as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but is inadmissible when the evidence is relevant solely to prove bad character or propensity. *See Williams v. State*, 110 So.2d 654, 662 (Fla.), *cert. denied*, 361 U.S. 874 (1959) (holding that evidence of other crimes is admissible and relevant if it tends to show a common scheme or plan).

[3]*See Huff v. State*, 622 So.2d 982, 983-84 (Fla. 1993) (finding that the petitioner was "denied due process of law because the [trial] court did not give him a reasonable opportunity to be heard," the court held that the trial court judge "must allow the attorneys the opportunity to appear before the court and be heard on an initial 3.850 motion. . . . to determine whether an evidentiary hearing is required and to hear legal argument relating to the motion.").

1.  Whether the lower court erred in denying Chandler's request for an evidentiary hearing on his claim that defense counsel was ineffective for failing to seek a venue change from Orange County;

2.  Whether counsel was ineffective for admitting that the State could prove Chandler's guilt in the Madeira Beach case and in advising him to invoke his Fifth Amendment privilege regarding same; and

3.  Whether counsel was ineffective in failing to object to statements made during the State's closing arguments.

The Florida Supreme Court affirmed the trial court's decision on April 17, 2003. Rehearing was denied on June 24, 2003, and the mandate issued on July 24, 2003. *See Chandler v. State*, 848 So.2d 1031 (Fla. 2003) (hereinafter *Chandler II).*

Chandler filed his § 2254 petition on June 26, 2003 (Dkt. 1). In his petition, Chandler asserts that his Sixth Amendment right to effective assistance of counsel was violated when trial counsel: (1) failed to move for a change of venue for the jury selection; (2) conceded that the state could prove that Chandler was guilty in the Madeira Beach rape case; (3) advised Chandler to invoke his Fifth Amendment right against self-incrimination when questioned about the Madeira Beach rape; and (4) failed to object to statements made by the prosecutor during closing arguments. Each of these grounds was raised as either a claim or subclaim in Chandler's Rule 3.850 motion. Respondent acknowledges that the claims are exhausted, but asserts that Chandler has failed to demonstrate that he is entitled to relief under 28 U.S.C. § 2254.

## Standards of Review

Because Chandler filed his petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Henderson v. Campbell*, 353 F.3d 880, 889-90 (11th Cir. 2003). In order to "prevent federal habeas 'retrials' and to ensure

that state-court convictions are given effect to the extent possible under law," the AEDPA establishes a deferential standard of review of state habeas judgments. *Bell v. Cone*, 535 U.S. 685, 693 (2002); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

Pursuant to AEDPA, habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application, of clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Price v. Vincent*, 538 U.S. 634, 638-39 (2003); *Clark v. Crosby*, 335 F.3d 1303, 1308 (11th Cir. 2003). "Clearly established Federal law" is the governing legal principle, not the dicta, set forth by the United States Supreme Court at the time the state court issues its decision. *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Where no Supreme Court precedent is on point, or the precedent is ambiguous, it cannot be said that the state court's conclusion is contrary to clearly established governing federal law. *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003); *Clark v. Crosby*, 335 F.3d at 1308-10.

A state court decision is "contrary to" the Supreme Court's clearly established precedent within the meaning of § 2254(d)(1) only if the state court applies a rule that contradicts the governing law as set forth in Supreme Court case law, or if the state court confronts a set of facts that are materially indistinguishable from those in a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. *Mitchell v. Esparza*, 540 U.S. at 17 (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) (hereinafter "Williams I")). *See also Price v. Vincent*, 538 U.S. at 639. A state court does not have to cite Supreme Court precedent, or even be aware of it, so long as neither its reasoning nor its result contradicts Supreme Court precedent. *Early v.*

*Packer*, 537 U.S. 3, 8 (2002); *Parker v. Sec'y of Dep't of Corr.*, 331 F.3d 764, 775-76 (11th Cir. 2003).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Williams I*, 529 U.S. at 411.  The decision involves an unreasonable application of Supreme Court precedent if the state court identifies the correct governing legal rule from Supreme Court cases but unreasonably applies it to the facts of the particular inmate's case; or if the state court either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply; or unreasonably refuses to extend that principle to a new context where it should apply.  *Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir. 2000).  The "unreasonable application" inquiry requires the state court decision to be more than incorrect or erroneous; it must be objectively unreasonable.  *Lockyer v. Andrade*, 538 U.S. at 75-77; *Williams I*, 529 U.S. at 409-10. Whether a state court's decision was unreasonable must be assessed in light of the record the court had before it. *See Holland v. Jackson*, 542 U.S. 649, ___, 124 S.Ct. 2736, 2737-2738 (2004) (citing *Yarborough v. Gentry*, 540 U.S. 1 (2003)); *Miller-El v. Cockrell*, 537 U.S. 322, 348 (2003); *cf. Bell v. Cone*, 535 U.S. at 697, n. 4  (declining to consider evidence not presented to the state court in determining whether its decision was contrary to federal law).

"[A] determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1);  *Henderson v. Campbell*, 353 F.3d at 890-91.  The statutory presumption of correctness applies only to findings of fact

made by the state court, not to mixed determinations of law and fact. *Parker v. Head*, 244 F.3d 831, 836 (11th Cir. 2001), *cert denied*, 534 U.S. 1046 (2001). Because of the deference due the state court's findings of fact and conclusions of law, the state court's determination of each of Chandler's claims largely governs review of those claims. Accordingly, in order to determine the reasonableness of the state court's determinations, the review of each of Chandler's grounds will necessarily include a recitation of the state court's analysis. A petitioner who, through lack of diligence, "failed to develop" the factual basis for a claim while in state court is barred from doing so in federal court (subject to the very narrow exceptions set out in § 2254(e)(2)). *Williams v. Taylor*, 529 U.S. 420, 433-34 (2000) (hereinafter *"Williams II"*).

    "[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan v. Boerckel*, 526 U.S. 838,  842 (1999). *See also Henderson v. Campbell*, 353 F.3d at 891; *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998). "The teeth of the exhaustion requirement comes from its handmaiden, the procedural default doctrine." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001).   Under the procedural default doctrine, "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is applicable." *Id.* at 1138. A procedural default will only be excused in two narrow circumstances.  First, a petitioner may obtain federal habeas review of a procedurally defaulted claim if he shows both "cause" for the default and actual "prejudice" resulting from the default. "Cause" ordinarily requires petitioner to demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court. *Henderson v. Campbell*, 353 F.3d at

892; *Marek v. Singletary*, 62 F.3d 1295, 1302 (11th Cir. 1995).  To show "'prejudice," a petitioner must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his factual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *Hollis v. Davis*, 941 F.2d 1471, 1480 (11th Cir. 1991) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). A petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different.  *Henderson v. Campbell*, 353 F.3d at 892.

Second, a petitioner may obtain federal habeas review of a procedurally defaulted claim without a showing of cause or prejudice if such review is necessary to correct a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Henderson v. Campbell*, 353 F.3d at 892. This exception is only available "in an extraordinary case, [sic] where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Id.* The fundamental miscarriage of justice exception concerns a petitioner's "actual" innocence rather than his "legal" innocence. *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001) (citing *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) and *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986)). To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). The petitioner must show constitutional error coupled with "new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Id.* at 324.

**Ineffective Assistance of Counsel**

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-part test for determining whether a convicted person is entitled to habeas relief on

the ground that his or her counsel rendered ineffective assistance: (1) whether counsel's representation "fell below an objective standard of reasonableness;" and (2) whether there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687-88. *See also Wiggins v. Smith*, 539 U.S. 510, 534 (2003). A court must "judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (quoting *Strickland*, 466 U.S. at 690). This judicial scrutiny is "highly deferential." *Id.* at 477. A court must adhere to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689-90; *Bell v. Cone*, 535 U.S. at 698. Because the ultimate resolution of ineffective assistance of counsel claims is a mixed question of law and fact, the presumption of correctness contained in § 2254(e)(1) does not apply to this determination. *Parker v. Head*, 244 F.3d at 835-37. State court findings of historical facts made in the course of evaluating an ineffectiveness claim are, however, subject to § 2254(e)'s presumption of correctness.

"[T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" *Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (en banc), *cert. denied*, 536 U.S. 964 (2002) (quoting *Burger v. Kemp*, 483 U.S. 776 (1987)). The inquiry into whether a lawyer has provided effective assistance is an objective one: a petitioner must establish that no objectively competent lawyer would have taken the action that his lawyer took. *See Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000), *cert. denied*, 531 U.S. 1204 (2001). An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption of effective representation. Where the record is incomplete or unclear about counsel's actions, it will be presumed that he did what

he should have done, and that he exercised reasonable professional judgment. *Id.* at 1314 n.15.

## Evidentiary Hearing

The provisions of the AEDPA governing evidentiary hearings in federal habeas corpus cases are found at 28 U.S.C. § 2254(e)(2):

> If the applicant has failed to develop the factual basis of a claim in state court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that–
>
> A. the claim relies on (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> B. the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. 2254(e)(2). Consistent with the AEDPA goal of streamlining the habeas process, this provision "expressly limits the extent to which hearings are permissible, not merely the extent to which they are required." *Kelley v. Sec., Dep't of* Corr., 377 F.3d 1317, 1337 (11th Cir. 2004), *cert. denied*, __ U.S. __, 125 S.Ct. 2962 (Jun. 27, 2005).

Under the AEDPA, if a petitioner failed to develop the factual basis of a claim in state court, the federal court must deny him an evidentiary hearing unless he meets one of the two narrow exceptions set forth in §§ 2254(e)(2)(A) and (B). *See Breard v. Greene*, 523 U.S. 371, 376 (1998). Even if a petitioner convinces the district court that he diligently sought to develop the factual basis of a claim for habeas relief but was denied the opportunity to do so by the state court, the petitioner must still persuade the district court that the facts supporting the claims for which the evidentiary hearing is requested "would be sufficient to establish by clear and convincing evidence that but for constitutional error,

no reasonable factfinder would have found [the petitioner] guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(B).

Chandler acknowledges that an evidentiary hearing was held in state court on three of the four claims presented in the petition, but asserts that his claim that Zinober was ineffective for failing to file a second request for a change of venue cannot be adequately adjudicated without an evidentiary hearing to determine if the Orange County venire pool was partial (Dkt. 16 at 12). In support of his request for an evidentiary hearing, Chandler cites *Breedlove v. Moore*, 279 F.3d 952 (11th Cir. 2002), arguing that he, like Breedlove, was precluded from developing relevant facts in support of this claim and denied the opportunity to present evidence related thereto at each stage of his state court proceedings (Dkt. 16 at 14).

First, the state trial court's failure to hold an evidentiary hearing on a  collateral claim does not state a federal constitutional violation and is therefore not a basis for federal habeas corpus relief. *See, e.g., Spradley v. Dugger*, 825 F.2d 1566, 1568 (11th Cir. 1987) (where a claim goes to issues unrelated to the cause of the petitioner's detention, the claim does not state a basis for habeas relief). Secondly, Chandler's argument that he was prevented from developing the factual basis for this claim despite diligent efforts to raise the claim at every stage of the state court proceedings is refuted by the record.

A review of Chandler's appellate brief confirms that "[o]n direct appeal, Chandler did not challenge any members of the Orange County jury as being unfair or unable to be impartial." *Chandler II*, 848 So.2d at 1035. The state courts determined that to the extent that Chandler argues that the jury was somehow unfair or biased, his claim is procedurally barred. *Id.*

Under Florida law, issues which either were or could have been litigated at trial and upon direct appeal are not cognizable through collateral attack.  *See* Fla. R. Crim. P. 3.850 ("This rule does not authorize relief based on grounds that could have or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence."); *Harvey v. Dugger*, 656 So.2d 1253, 1256 (Fla. 1995).   It is a state's prerogative to fix the contours of its procedural rules, and this circuit has long recognized this aspect of Florida law.  *Sullivan v. Wainwright*, 695 F.2d 1306, 1310 (11th Cir.), *cert. denied*, 464 U.S. 922 (1983) (claims that could have been or should have been reserved at trial and then raised on direct appeal and were not are procedurally barred).

In *Breedlove*, the Florida Supreme Court reached the merits of Breedlove's *Brady* claim even though it was procedurally barred under state law and rejected it.   *Breedlove v. Moore*, 279 F.3d at 959.  It is well-settled law that a federal claim is not barred on federal habeas review if the state courts actually address the claim on the merits.   Thus, in *Breedlove*, since the highest state court to review his claim addressed it on the merits, the federal habeas court entertained the claim without regard to whether there was a procedural bar to the claim under state law.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991) (holding that a state procedural bar will be removed if the last state court to be presented with a particular federal claim reaches the merits of the claim).

Other than *Breedlove*, which is inapposite, Chandler does not point to any case law to support his assertion that this claim should be heard on the merits despite the procedural bar. When, as in the instant case, a state court has declined to address federal claims because the defendant failed to meet a state procedural requirement, the independent and adequate state grounds doctrine applies to bar federal habeas review.

Thus, this Court is precluded from addressing the merits of Chandler's assertion that the Orange County venire pool was partial unless Chandler can demonstrate "cause  and prejudice" for his procedural default or that he is "actually innocent" of the charged offense. *See Johnson v. Singletary,* 938 F.2d 1166, 1174-75 (11th Cir. 1991). *See also Murray v. Carrier*, 477 U.S. 478, 496 (1986); *Wainwright v. Sykes*, 433 U.S. 72 (1977).  In his reply to Respondent's response, Chandler has advanced no explanation whatever for his failure to raise this claim on direct appeal.   Chandler focuses instead on his "diligence" in attempting to raise the issue of presumed prejudice in his Rule 3.850 proceedings. Notably, Chandler has never presented a claim of ineffective assistance of counsel on appeal. Chandler has not demonstrated valid cause to excuse his procedural default or alleged facts to support a colorable showing of actual innocence. *See Wainwright v. Sykes*, 433 U.S. at 90-91. The Court will not conduct an evidentiary hearing to consider a claim which is procedurally defaulted.

### Discussion

Each of the four grounds presented in the Petition challenge Zinober's performance during the guilt phase of Chandler's trial.   According to Chandler, he was denied his Sixth Amendment right to effective assistance of counsel when Zinober:

1.   Failed to seek a second change of venue;

2.   Conceded that the state could prove Chandler's guilt for the sexual battery in the Madeira Beach case;

3.   Failed to protect Chandler from cross-examination regarding the Madeira Beach case; and

4.   Failed to protect Chandler by objecting to improper comments made by the prosecutor during closing argument.

Dkt. 1.  Each claim was raised and rejected in Chandler's Rule 3.850 proceedings.  A review of the decisions rejecting these claims confirms that the state courts set forth the correct standard of review for an ineffective assistance of counsel claim, as enunciated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. at 687.  *See Chandler II*, 848 So.2d at 1035; Dkt. 19, App. C, Vol. 11 at 2056.  Thus, to be entitled to relief under § 2254, Chandler must establish that the state courts' application of the *Strickland* standard in reaching the determination that the claims raised in his Rule 3.850 motion lack merit was objectively unreasonable or that the decision "was based on an unreasonable determination of the facts in light of the evidence presented." *See* 28 U.S.C. § 2254(d).

**Ground One**

In Ground One of the petition, Chandler contends that Zinober rendered ineffective assistance in failing to seek a second change of venue due to extensive pretrial publicity that allegedly tainted the Orange County venire pool. Chandler's principal argument is that the pretrial publicity in his case was so intense that the trial court would have found, had Zinober brought the publicity to the court's attention, that he met the presumed prejudice standard, and therefore would have granted a motion for change of venue. Although the claim that the jury was partial is procedurally barred as a substantive claim, *see* discussion *supra*, because the ultimate resolution of an ineffective assistance of counsel claim is a mixed question of law and fact, *see Thompson v. Haley*, 255 F.3d 1292, 1292 (11th Cir. 2001), the Court finds that a discussion of Chandler's assertion that the Orange County venire pool was tainted by pretrial publicity is in order.

In rejecting this claim, the Florida Supreme Court stated:

The indictment in this case alleged that the murders occurred in either Pinellas County or Hillsborough County, Florida.   Pursuant to section 910.03(1), Florida Statutes (1993), Chandler initially elected to be tried in Hillsborough County.   Subsequently, Chandler's trial counsel filed a motion for change of venue, alleging that Chandler could not get a fair and impartial trial anywhere in the Tampa Bay area.   Prior to hearing the motion, the trial court contacted defense counsel and the State to determine if the parties could reach an agreement to conduct the trial in Pinellas County.   Pursuant to a new law, the trial court had the option of picking a jury from another county and bringing the jurors to Pinellas County for the trial.   *See* § 910.03(3), Fla. Stat. (Supp.1994).   Before hearing Chandler's change of venue motion, the trial court informed the parties that if a stipulation could be entered wherein Chandler would elect Pinellas County over Hillsborough County, the court would agree to select the jury in Orange County and return the jurors to Pinellas County, where they would be sequestered during trial. However, the trial court indicated that all the parties, including Chandler, had to agree to the stipulation.   A hearing was held on the motion for change of venue, at which the court explained the stipulation to Chandler in great detail. After the hearing, the trial court entered an order explaining the stipulation and stating that the parties and Chandler had agreed to the stipulation.[FN5] The order also indicated that in the event any portion of the stipulation was rescinded, the entire stipulation would be rescinded.

> [FN5] The order stated, in relevant part, that:  (1) Chandler rescinded his election to be tried in Hillsborough County and elected to be tried in Pinellas County;  (2) the jury would be sequestered;  and (3) the jury would be selected from Orange County because a fair and impartial jury could not be impaneled in Pinellas County.

In the order denying Chandler's current postconviction motion, the trial court stated that a subsequent motion to change venue objecting to the jury being picked in Orange County would have caused her to consider the previous stipulation void. The trial court also stated that if the stipulation had been voided, any change of venue motion that Chandler filed would have been held in abeyance while the court attempted to pick an impartial jury in Hillsborough County, the county of original venue. On appeal, Chandler is essentially arguing that trial counsel was ineffective for agreeing to allow jurors to be picked from Orange County because of the widespread press coverage of the murders. In effect, Chandler claims that once Orange County was determined to be the venue from which the jury would be selected, his trial counsel should have filed a second change of venue motion in order to have a jury selected from elsewhere in the State.

In denying Chandler relief on this claim, the trial court first determined that the underlying issue was procedurally barred.  We agree.  On direct appeal, Chandler did not challenge any members of the Orange County jury as being unfair or unable to be impartial.  Therefore, to the extent that he argues that

the jury was somehow unfair or biased, his claim is procedurally barred. *See, e.g., Harvey v. Dugger,* 656 So.2d 1253, 1256 (Fla. 1995) (holding that claims that could have been brought in direct appeal were procedurally barred from being brought in postconviction proceedings); *Swafford v. Dugger,* 569 So.2d 1264, 1267 (Fla. 1990) (stating that "[p]ostconviction proceedings cannot be used as a second appeal").

Furthermore, Chandler has not established either element of the test for establishing ineffective assistance of counsel. In order to prove an ineffective assistance of counsel claim, a defendant must establish two elements:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also Wike v. State,* 813 So.2d 12, 17 (Fla. 2002); *Rutherford v. State,* 727 So.2d 216, 219-20 (Fla. 1998); *Rose v. State,* 675 So.2d 567, 569 (Fla. 1996). To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Ineffective assistance of counsel claims present a mixed question of law and fact subject to plenary review based on the *Strickland* test. *See Stephens v. State,* 748 So.2d 1028, 1033 (Fla. 1999). This requires an independent review of the trial court's legal conclusions, while giving deference to the trial court's factual findings. *See id.*

Generally, claims of ineffective assistance of counsel regarding change of venue are brought where counsel either did not file a change of venue motion, *see, e.g., Buford v. State,* 492 So.2d 355 (Fla. 1986), or where counsel failed to obtain a change of venue, *see, e.g., Rolling v. State,* 695 So.2d 278 (Fla. 1997). Chandler, by way of comparison, was given an initial selection between Pinellas or Hillsborough counties based on the indictment, and was given the additional option of stipulating to have his jury selected from Orange County. Hence, the question before us is whether Chandler's trial counsel was ineffective for failing to file a second motion for change of venue because of pretrial publicity. With regard to when a change of venue

is necessary to protect a defendant's rights, we have provided the following test:

> The test for determining a change of venue is whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and pre-conceived opinions that jurors could not possibly put these matters out of their minds and try the case solely on the evidence presented in the courtroom.

> The trial court in its discretion must determine whether a defendant has raised such a presumption of prejudice under this standard· · · · In exercising its discretion, a trial court must make a two-pronged analysis, evaluating: (1) the extent and nature of any pretrial publicity; and (2) the difficulty encountered in actually selecting a jury.

*Rolling,* 695 So.2d at 284-285 (citations omitted) (quoting *McCaskill v. State,* 344 So.2d 1276, 1278 (Fla. 1977)). Furthermore, the existence of pretrial publicity in a case does not necessarily lead to an inference of partiality or require a change of venue:

> [P]retrial publicity must be examined in the context of numerous circumstances, including; (1) when it occurred in relation to the time of the crime and the trial; (2) whether the publicity was made up of factual or inflammatory stories; (3) whether the publicity favored the prosecution's side of the story; (4) the size of the community; and (5) whether the defendant exhausted all of his peremptory challenges.

*Foster v. State,* 778 So.2d 906, 913 (Fla. 2000); *see Rolling,* 695 So.2d at 285. In the postconviction context where a defendant is claiming that counsel was ineffective with regard to a venue issue:

> [T]he defendant must, at a minimum "bring forth evidence demonstrating that there is a reasonable probability that the trial court would have, or at least should have, granted a motion for change of venue if [defense] counsel had presented such a motion to the court." *Meeks v. Moore,* 216 F.3d 951, 961 (11th Cir. 2000); *see also Povenzano v. Dugger*, 561 So.2d 541, 545 (Fla. 1990) (concluding that counsel was not ineffective for failing to renew the motion for change of venue because it was a tactical decision and because "it is most unlikely that a change of venue would have been granted because there were no undue difficulties in selecting an impartial jury).

*Wike,* 813 So.2d at 18. Moreover, the decision regarding whether to seek a change of venue is "usually considered a matter of trial strategy by counsel,

and therefore not generally an issue to be second-guessed on collateral review." *Rolling v. State,* 825 So.2d 293, 298 (Fla. 2002).

Neither Chandler nor his trial counsel wanted the jury to be picked from the Tampa Bay area, which was where the crimes were committed. The trial judge in her order denying Chandler postconviction relief stated that both Chandler and his trial counsel knew that she would try to pick the jury from Hillsborough County before granting a change of venue.[FN6] Her revelation that she would have tried to pick a jury before granting the motion was appropriate. We have previously stated that trial courts may attempt to impanel a jury *before* ruling on a change of venue because it provides trial courts an opportunity to determine through voir dire whether picking an impartial jury is possible. *See Foster v. State,* 778 So.2d 906, 913 (Fla. 2000); *Henyard v. State,* 689 So.2d 239, 245 (Fla. 1996); *Davis v. State,* 461 So.2d 67, 69 n.1 (Fla. 1984); *Manning v. State,* 378 So.2d 274, 276 (Fla. 1979). Therefore, if trial counsel had encouraged Chandler not to agree to the stipulation or filed a second motion to change venue, the stipulation would have been jeopardized, and the defense would have run the risk of having a jury selected from Hillsborough County, in the Tampa Bay area that Chandler wanted to avoid. Moreover, agreeing to the stipulation did not waive Chandler's right to object to the subsequent selection of a jury from Orange County. Trial counsel testified at the evidentiary hearing that if he had not been able to select a jury in Orange County, he would have moved for a change of venue at that point.[FN7]

[FN6] At the evidentiary hearing, trial counsel agreed that the judge was "absolutely correct" after she explained the nature of the stipulation:

> What I wanted to make sure is clear on this record is [the stipulation] was a package. If Mr. Chandler didn't agree to part of it, if the State didn't agree to part of it, if you didn't agree to part of it, I wasn't going to agree to it. We were going to go to Hillsborough County where I believed we could pick a jury and get the case done.

[FN7] At the evidentiary hearing, Chandler also agreed that his understanding of the stipulation was that he had the right to seek a venue change from Orange County if it became obvious that there was going to be great difficulty selecting a jury there.

Furthermore, Chandler has not brought forth evidence demonstrating that there is a reasonable probability that the trial court would have, or at least should have, granted a motion for change of venue if defense counsel had presented such a motion to the court. *See Provenzano v. Dugger,* 561 So.2d 541, 545 (Fla. 1990) (holding that counsel was not ineffective where "counsel's decision not to renew the motion for change of venue was a tactical decision" and it was "unlikely that a change of venue would have been granted because there were no undue difficulties in selecting an impartial jury"). The trial judge's order explicitly states that if Chandler had moved for a second change of venue, the stipulation would have been

considered rescinded and she would have proceeded to attempt to pick an impartial jury from Hillsborough County before she would have granted a change of venue.

Even if trial counsel's actions were somehow deficient, Chandler cannot meet the prejudice prong of *Strickland,* in part because he cannot show prejudice under the test we enunciated in *Rolling,* which requires the trial court to consider (1) the extent of the pretrial publicity and (2) the difficulty encountered in seating the jury. *See Rolling,* 695 So.2d at 285.[FN8] Even if we were to accept Chandler's factual allegations regarding the amount of pretrial publicity as true, Chandler would still not be entitled to relief because he has not shown that there was any difficulty encountered in selecting his jury. In denying the claim, the trial court referred to three facts in particular:

> [FN 8] The trial court only granted an evidentiary hearing on this claim "as to defendant's waiver" and did not allow evidence regarding the amount of pretrial publicity. Because the trial court did not hold an evidentiary hearing on the amount of pretrial publicity, the only information in this record regarding the extent and nature of pretrial publicity comes in the way of the supplemental record, which includes the report prepared by Chandler's media expert. This Court has summarized the applicable standard when reviewing a summary denial of a postconviction motion:
>
> > [A] defendant is entitled to an evidentiary hearing on a postconviction relief motion unless (1) the motion, files, and records in the case conclusively show that the prisoner is entitled to no relief, or (2) the motion or a particular claim is legally insufficient. The defendant bears the burden of establishing a prima facie case based upon a legally valid claim. Mere conclusory allegations are not sufficient to meet this burden. However, in cases where there has been no evidentiary hearing, we must accept the factual allegations made by the defendant to the extent that they are not refuted by the record. We must examine each claim to determine if it is legally sufficient and, if so, determine whether or not the claim is refuted by the record.
>
> *Freeman v. State,* 761 So.2d 1055, 1061 (Fla. 2000) (citations omitted). Because we find that Chandler's claim is refuted by the record, we agree that there was no need for an evidentiary hearing on the amount of pretrial publicity in the case.

1) Only 4 of the 12 jurors who served knew *anything* about this case. None of them had formed any opinion about the guilt or innocence of the defendant. 2) In this case that was to last four weeks, with jurors having to come to Pinellas County from Orange County and be sequestered for the entire time, it only took 1 ½ days to pick a jury. 3) Neither side exercised all its preemptory [sic] challenges, with Chandler choosing to exercise *only 4* of his 10 challenges.  Our examination of the jury selection process in this case supports the trial court's observation that an impartial jury was seated with relative ease. Most of the prospective jurors who were questioned indicated that they had not heard about the case.[FN9] Thus, under these circumstances, we affirm the trial court's denial of this claim.

[FN 9] The trial court noted that it only took a day and a half to pick the jury, which is substantially less time than other high-profile cases that this court has reviewed where media attention to the case was an issue. *See, e.g., Rolling,* 695 So.2d at 287 (stating that jury selection "spanned a three-week period"). Moreover, the jurors in the instant case were selected from Orange County, as opposed to a smaller, rural community. This Court has stated that in determining the prejudicial impact of intense publicity the size of the community is a factor to be considered. *See, e.g., Copeland v. State,* 457 So.2d 1012, 1017 (Fla. 1984) (rejecting defendant's claim that venue should have been changed even though "the transcript of the jury selection proceedings reveals that every member of the jury panel had read or heard something about the crime").

*Chandler II,* 848 So.2d at 1035-38.

Chandler contends that the Florida Supreme Court's determination that he failed to satisfy either prong of the *Strickland* test is objectively unreasonable when considered in light of clearly established Federal law, citing *Irvin v. Dowd*, 366 U.S. 717 (1961), and *Sheppard v. Maxwell*, 384 U.S. 333 (1966).

The United States Supreme Court has established two standards to guide courts when considering whether pretrial publicity necessitates a change of venue to ensure an impartial jury -- the "actual prejudice" standard and the "presumed prejudice" standard. Chandler does not address any particular seated juror's voir dire and fails to assert, much less provide, clear and convincing evidence, that the jurors empaneled could not be impartial.  He does not attempt to show "actual prejudice," focusing instead on the "presumed prejudice" standard and pretrial publicity.  If successful, Chandler's argument that prejudicial and inflammatory pretrial publicity saturated Orange County such that he was denied his Sixth Amendment right to be tried by "a panel of impartial, 'indifferent' jurors," *Coleman v. Kemp*, 778 F.2d 1487, 1489 (11th Cir. 1985), would afford him the relief he seeks without requiring him to prove that local prejudice actually entered the jury box. *See Pamplin v. Mason*, 364 F.2d 1, 6-7 (5th Cir. 1966). *See also Mayola v. Alabama,* 623 F.2d 992, 997 (5th Cir. 1980) ("[W]here a petitioner adduces evidence of inflammatory,

prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community, '(jury) prejudice is presumed and there is no further duty to establish bias' " (quoting *United States v. Capo,* 595 F.2d 1086, 1090 (5th Cir. 1979)) (additional citations omitted), *cert. denied*, 451 U.S. 913 (1981). Chandler would thus avoid the procedural default which prevents him from raising a claim of juror partiality.

Under the "presumed prejudice" standard, extensive adverse pretrial publicity can create such a presumption of prejudice in a community that jurors' assurances of their impartiality should not be believed. *Patton v. Yount,* 467 U.S. 1025, 1031 (1984); *Murphy v. Florida*, 421 U.S. 794, 799 (1975). The cases in which the Supreme Court has presumed prejudice in the face of juror attestation to the contrary demonstrate that this finding is reserved for an "extreme situation." *Meeks v. Moore*, 216 F.3d 951, 961 (11th Cir. 2000). *See Sheppard v. Maxwell*, 384 U.S. at 363; *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963); *Irvin v. Dowd*, 366 U.S. at 728. In those cases where "presumed prejudice" was found, the influence of the news media, either in the community at large or the courtroom itself, "pervade[d] or saturate[d] the community as to render virtually impossible a fair trial by an impartial jury drawn from the community." *Meeks v. Moore*, 216 F.3d at 961. "[E]xtensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself" to create such a presumption. *Dobbert v. Florida*, 432 U.S. 282, 303 (1977).

**Deficient Performance**

Under Florida law, as enunciated by the Florida Supreme Court in *Rolling,* in exercising its discretion to grant a change of venue, the trial  court must consider: (1) the extent of the pretrial publicity and (2) the difficulty encountered in seating the jury. *Rolling v. State*, 695 So.2d 278, 285 (Fla. 1997). This is consistent with federal law.  If the trial

court is unable to seat an impartial jury because of prejudicial pretrial publicity or an inflamed community atmosphere, due process requires that the trial court grant a defendant's motion for a change of venue, *see Rideau v. Louisiana,* 373 U.S. at 726, or consider granting a motion for continuance, *see Sheppard v. Maxwell,* 384 U.S. at 362-63. Chandler wanted to avoid a continuance (Dkt. 19, App. C, Vol. 10 at 1862-63).

## A.  Pretrial Publicity

The Rogers murders occurred on Florida's west coast in the Tampa Bay area. Orange County, Florida, is located in central Florida, approximately 90 miles northeast of the Tampa Bay area.  According to estimates by the Census Bureau, when the Rogers murders occurred in 1989, Orange County had a population of 677,491. When Chandler was indicted in 1992, Orange County's population had risen to 725,347. Its population had grown to 764,593 by 1994 when Chandler went to trial. *See* Fla. Intercensal Population Estimates by County, Census Bureau, U.S. Dep't of Commerce, available at http:/www.census.gov/popest/archives/1990s/co-99-11/crhfl94.txt,  viewed on June 15, 2005.

In support of Chandler's claim that Zinober was ineffective for failing to move for a change of venue from Orange County, post-conviction counsel proffered two reports prepared by media consultant Paul Wilson (Dkt. 19, App. C, Vol. 13).  The May 23, 2000 Media Analysis ("Wilson I") deals primarily with the sources of media coverage in the Tampa Bay area and Orange County in general terms, whereas the December 7, 2000 Media Research and Analysis ("Wilson II") presents estimates of the nature and extent of pretrial publicity in Orange County related to the Rogers murders and Chandler's arrest and trial (Dkt. 19, App. C., Vols. 13 and 14).

### 1. **Newspapers**

There were four "major" newspapers printed and circulated daily in the Orlando area when Wilson prepared his reports: the *Orlando Sentinel*, the *Daytona Beach News Journal*, the *Lakeland Ledger*, and the *Winterhaven News Chief*. According to Wilson, 117,000 copies of the *Orlando Sentinel's* daily edition were placed in circulation in Orange County "every weekday, as audited by Scarborough[4] in 1999" (Dkt. 19, App. C, Vol. 13 at 133). Although Wilson asserts that the coverage of the Rogers murders "in the *Orlando Sentinel* was substantial," he does not provide any information regarding the circulation of the newspaper during the period 1989-1994, stating instead that "coverage, per year, of the case in the *Orlando Sentinel* was sizable, as evidenced by the attached copies of the newspaper articles." *Id.* at 140. Wilson fails to provide any information regarding the circulation of any of the other newspapers identified as servicing Orange County.

Wilson II includes copies of the ten articles published by the *Orlando Sentinel* between June 10, 1989, and May 30, 1990, which relate to the Rogers murders. These articles provide facts regarding the discovery of the bodies, the cause of death, and the progress of the investigation (Dkt. 19, App. C, Vol. 13 at 142-158). Since he had not yet been identified as a suspect in the case, none of the articles mention Chandler. Four of the articles contain a comment on the similarities between the rape of a woman on May 16, 1989, at Madeira Beach and the Rogers murders, stating that the suspect in the rape case may have been involved in the triple murder (Dkt. 19, App. C, Vol. 13 at 142-158).

There was renewed interest in the case in 1992, when the St. Petersburg Police announced that a suspect had been identified in the case. Once he was arrested on the

---

[4]Neither of the Wilson reports explains the origin of this information other than the reference to the "Scarborough figures" (Dkt. 19, App. C, Vol. 13 at 133).

rape charge, Chandler was identified as a suspect in the murders. A May 6, 2000 electronic search of the *Orlando Sentinel* archives for articles mentioning "Oba Chandler" revealed that the newspaper published ten articles between September 25, 1992, and November 18, 1992, related to the investigation of the Rogers murders and Chandler's arrest (Dkt. 19, App. C, Vol. 13 at 159-174). Some information reported in these articles was unfavorable to Chandler. For example, shortly after Chandler was named as a suspect in the Rogers murders, a law enforcement officer was quoted as saying "[w]e're looking at him for a lot of different crimes. . . . We think he is going to turn out to be a one-man crime wave." *Id.* at 162. The newspaper also reported that Chandler had a criminal record and had recently worked as a confidential informant for the United States Customs Service. The articles are clearly factual in nature and do not sensationalize the crime or engage in personal attacks on Chandler.

The *Orlando Sentinel* published eight articles referencing Chandler between February 3, 1993, and November 11, 1993, of which one related to the use of billboards as a tool in crime solving and one related to an armed robbery which occurred in neighboring Volusia County in 1991. The most damaging article published during this period provided details of Chandler's family life and comments allegedly made by family members regarding his guilt. *Id.* at 178, 193-97. Mention was also made of Chandler's criminal history and statements by an unidentified cellmate who claimed to have information regarding the Rogers murders that he wanted to use as leverage in securing a negotiated sentence. *Id.* at 180. One article reported that Chandler entered a guilty plea to a $750,000 armed robbery. *Id.* at 185. He was also reported to be a suspect in other unsolved rapes and an attempted abduction that occurred in 1991. *Id.* at 182.

Nine articles related to the upcoming trial were published in the *Orlando Sentinel* between June 8, 1994, and September 13, 1994, when jury selection concluded. Wilson categorizes three of the nine articles as "inflammatory" (Dkt. 19, App. C, Vol. 14 at 200). The first is an article reporting that Chandler's wife was unable to provide an alibi for him for either the night of the Madeira Beach rape or the night the Rogers murders occurred. *Id.* at 203. The second article Wilson finds to be "inflammatory" states that 14 former cellmates were prepared to testify against Chandler. One of the 14 men stated that Chandler told him details of the Rogers murders and confided that a "buddy" was with him on the boat when the murders occurred. *Id.* at 206. The third article characterized as "inflammatory" states that Chandler's son-in-law, Rick Mays, was prepared to testify that in 1989, Chandler "boasted of raping and murdering women." *Id.* at 208. A review of the articles confirms that, again, while much of the information is unfavorable to Chandler, the reports are generally a straightforward recitation of facts, without the tabloid hype and embellishment often employed to incite the reader. The articles provided information regarding the nature of the crimes, the on-going investigation, the theory of the case from the perspective of both the prosecution and the defense, and trial preparation.

Seventeen of the *Orlando Sentinel* articles referenced in Wilson II were published after the jury had been selected and instructed not to read or listen to reports about the case. *Id.* at 217-244. One article was published while Chandler's direct appeal was pending. Post-trial newspaper coverage of Chandler's case also extended beyond the Tampa Bay/Orange County areas. Included in Wilson's report are 25 articles published post-trial in either the *Bradenton Herald*, *Miami Herald*, *The Cincinnati Post*, *Tallahassee Democrat*, or *Akron Beacon Journal*. *Id.* at 245-53. These articles are clearly not relevant to Chandler's claim that a change of venue was required due to pretrial publicity.

According to Wilson, the "major" newspapers published in the Tampa Bay area during the relevant time periods were the *St. Petersburg Times*, *The Tampa Tribune*, *The Lakeland Ledger*, *Winterhaven News Chief*, *Sarasota Herald Tribune*, and *Bradenton Herald* (Dkt. 19, App. C, Vol. 13 at 69). *The Tampa Tribune* is the only newspaper published in the Tampa Bay area for which Wilson provides any statistical data. Accepting Wilson's assertion that *The Tampa Tribune* "ran hundreds of stories on the case"[5] during the five-year period between the murders and Chandler's trial and assuming that each copy of the newspaper went to an occupied household, based on information extracted from Wilson's report, as set forth below, *The Tampa Tribune* did not reach 1% of the occupied households in Orange County daily at any time during the five years between the discovery of the victims' bodies and commencement of the trial.

### *THE TAMPA TRIBUNE* CIRCULATION IN ORANGE COUNTY
### 1989 - 1994

| Year | Daily Edition | Sunday Edition | Occupied Households |
|------|------|------|------|
| 1989 | 266 | 368 | 242,700 |
| 1990 | 315 | 461 | 256,300 |
| 1991 | 455 | 578 | 262,600 |
| 1992 | 1,117 | 1,373 | 269,700 |
| 1993 | 1,135 | 1,475 | 274,500 |
| 1994 | 1,577 | 1,826 | 277,800 |

---

[5]In the motion for change of venue filed June 9, 1994, Zinober informed the trial court that "the two local publications with the largest circulation, the *St. Petersburg Times* and *The Tampa Tribune* published well over 170 articles referencing the homicide and Oba Chandler" (Dkt. 19, App. A, Vol. 29 at 4460).

(Dkt. 19, App. C, Vol. 13 at 69).[6]  Wilson does not suggest that any member of the jury panel  had any media-supplied information beyond the matters stated in the voir dire stage of the proceedings.

In summarizing his report, Wilson states that "it is the intent of this media analysis to demonstrate the role media may have played in preventing juror impartiality" in Orange County (Dkt. 19, App. C, Vol. 13 at 5). All Wilson I and II establish is that *some* articles considered by the defense to be inflammatory appeared in two newspapers that were available to *some* residents of Orange County prior to the selection of the jury.  The vast majority of the material upon which the report is based simply recounts the various stages and activities in the case, containing little more information than the trial court supplied in its introductory statement of the case.  In fact, of the articles and broadcasts referenced in the 195 pages comprising the two reports Wilson compiled in support of the assertion that Orange County was a partial venue due to prejudicial pretrial publicity, he identifies only seven articles as "inflammatory," and four of the seven were published a year or more before the Orange County venire pool was convened for voir dire (Dkt. 19, App. C, Vol. 13 at 175; Vol. 14 at 200). The assertion that Orange County was a partial venue is not supported by the fact that a newspaper published in the Tampa Bay area had *some* readers in Orange County, particularly given the small number of papers distributed there.

### 2.  Television and Radio

A quantitative and qualitative analysis of the television and radio coverage of the Rogers murders during the period 1989 through selection of the jury in 1994 is relevant to determining whether pretrial publicity tainted the Orange County venire pool when

---

[6]Wilson estimated that *The Tampa Tribune*'s distribution in Orange County was 4,865 copies of its daily edition every Monday through Saturday and 6,081 copies of its Sunday edition. This is an aggregation of *The Tampa Tribune*'s distribution for the five year period 1989-1994. *See* Dkt. 19, App. C, Vol. 13 at 36.

Chandler's case went to trial.  The Wilson reports do not provide a basis for the Court to conclude that a change of venue motion was warranted once the decision was made to proceed to trial with an Orange County jury.

The Court agrees with Wilson that "[i]Impartiality is often times affected by pretrial media coverage in newspapers, television and radio, as well as other media like billboards and the internet" (Dkt. 19, App. C, Vol. 13 at 73).  But demonstrating "the role media may have played in preventing juror impartiality," *id.* at 5, is simply not enough to carry the burden a habeas petitioner has to meet the "presumed prejudice" standard.  Particularly so when, as discussed below, the petitioner's argument is premised on data which is not relevant to pretrial publicity for his case.  The information proffered by Wilson falls far short of establishing that Orange County was "saturated" with "inflammatory, prejudicial pretrial publicity" so "pervasive . . . as to render virtually impossible a fair trial by an impartial jury drawn from that community." *Coleman v. Kemp*, 778 F.2d at 1490 (citation omitted).

According to Wilson, the total estimated "occupied households" in Orange County in 1994 was 277,800 (Dkt. 19, App. C, Vol. 13 at 139).  Information obtained from Nielsen Media Research, which produces local ratings for television stations based on household members' viewing habits, and Arbitron, which measures television and radio audience levels, presented in conjunction with contour maps generated in accordance with Federal Communications Commission regulations form the basis for Wilson's conclusion that "some radio and television stations from the Tampa Bay area broadcast to Orange County [and] . . . some residents of Orange County can, and do, listen and watch radio and television, respectively, from stations that broadcast from the Tampa Bay [area]."

Much of the statistical data relied on to support Chandler's argument that the Orange County venire pool was tainted by pretrial publicity was extracted from tables and charts

depicting the scope of the broadcast signals and the market size outside the relevant time period.  For example, the Nielson reports on which Wilson relies reflect data for 1996-1997, and the Arbitron tables reflect data compiled for 1991 and the summer of 1999. To document his theory that signal crossover or spillage between the Tampa Bay area and Orange County markets resulted in pretrial publicity tainting the Orange County venire pool, Wilson uses contour maps that detail radio broadcast and television signal integrity.  The contour maps he uses, however, do not reflect signal strength during the relevant time periods.

The only information Wilson presents which is relevant to this discussion relates to national media coverage.  The Rogers murders received attention from three syndicated television programs: *Unsolved Mysteries* (NBC television broadcast, Nov. 3, 1991), *Inside Edition* (CBS television broadcast, Dec. 8, 1992), and *Hard Copy* (CBS television broadcast, Jan. 27, 1994).  *See* Dkt. 19, App. C, Vol. 14 at 121.  *Unsolved Mysteries*, a nationally syndicated television show, elevated the story of the Rogers murders to the national stage on November 3, 1991, when it featured a reenactment of the crime (Dkt. 19, App. A, Vol. 29 at 4551).  At that time, however, Chandler had not even been identified as a suspect in the case.

On December 8, 1992, *Inside Edition* featured the story of the Rogers murders. *Hard Copy* featured the story of the Rogers murders on January 27, 1994, again elevating the case to national attention.  As the transcripts for *Inside Edition* and *Hard Copy* demonstrate, each broadcast covered the case in explicit detail, employing graphic language sensationalizing the case.

*Inside Edition* interviewed Lula Harris, one of Chandler's sisters, during the broadcast. According to sworn statements made during her pretrial deposition, Ms. Harris

shared details she recalled of her brother's behavior during adolescence with members of the *Inside Edition* staff in a non-negative, factual manner. *Inside Edition* reporters, however, restructured the interview in a manner that insinuated that Ms. Harris was describing her brother in sinister terms, describing the interview as "relatives talk about the man they call Ob and the deadly double life he led." The television program portrayed what Ms. Harris described during her deposition as relatively innocent, boyhood activity such as killing rats that infested their neighborhood and playing hooky from school in a nefarious manner. *See* Dkt. 19, App. A, Vol. 29 at 4494-500.

The *Inside Edition* reporter described the Rogers murders as a crime that "defines evil" and detailed portions of Chandler's background which *may* have colored the minds of some viewers against Chandler. According to Wilson's calculations, approximately 119,322 of the 725,347 residents in Orange County *may* have viewed the show (Dkt. 19, App. C, Vol. 13 at 122). There is, of course, no way of knowing how many of the individuals who actually watched the show were eligible to serve as jurors when the case went to trial in 1994. Moreover, the *Inside Edition* story aired nearly two years before Chandler's trial. Thus, to the degree that statements made during the broadcast might be considered "inflammatory," the Court finds that the broadcast was too distant in time to affect the venire pool.

The story aired by *Hard Copy*, on the other hand, was broadcast eight months before Chandler's trial convened. *Hard Copy*, likewise, focused on the events surrounding the Rogers murders, the investigation, and the eventual arrest of Chandler. Like *Inside Edition*, *Hard Copy* presented sympathetic portrayals of the victims and disturbing comments about Chandler made by two of his family members, Lula Harris, and his daughter, Kristal, who would later testify that her father confessed to her that he committed

the rape and murders. Wilson estimates that 206,430 of the 764,593 residents of Orange County *may* have viewed the show (Dkt. 19, App. C, Vol. 13 at 121).  Again, there is no way of determining whether any of those who actually viewed the show were eligible to serve as jurors when the case went to trial on September 12, 1994.

Chandler has not met the "extremely heavy" burden, *see Coleman v. Kemp,* 778 F.2d at 1537, of demonstrating that the publicity surrounding his trial was sufficiently prejudicial or inflammatory to establish presumed prejudice. *See Dobbert v. Florida,* 432 U.S. 282, 302-03 (1977) (fact that community was made well aware of defendant's crimes was not sufficient to render trial fundamentally unfair); *Marsden v. Moore*, 847 F.2d 1536, 1543 (11th Cir. 1988) (finding that petitioner failed to establish presumed prejudice where 16 of 40 prospective jurors had read in part or in whole a newspaper article quoting incriminating statements made by petitioner's wife published the day before the trial and a broadcast by the local radio station having the largest audience among persons 18 years of age and older in the metropolitan area detailed the wife's incriminating statements to police about petitioner's guilt three months before the trial).

It is well-established that jurors need not "be totally ignorant of the facts and issues involved" in a case. *Irvin v. Dowd*, 366 U.S. at 722. Rather, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 723. "In determining the existence of presumptive prejudice, a court must consider the totality of the circumstances, including the type of pretrial publicity, the time lapse between peak publicity and the trial, and the credibility of prospective jurors who indicate during voir dire that they could be impartial despite having been exposed to pretrial publicity about the case." *United States v. Lehder-Rivas*, 955 F.2d 1510, 1523 (11th Cir. 1992). "The relevant question is not whether the community remembered the case, but

-35-

whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant." *Id.* (quoting *Patton v. Yount,* 467 U.S. at 1035).

These determinations are best made by the trial judge, who can assess the demeanor and candor of the prospective jurors. Under § 2254(e)(1), the trial court's determinations regarding partiality of the individual jurors during voir dire are factual findings entitled to deference unless Chandler can demonstrate by clear and convincing evidence that those determinations were erroneous. *See* 28 U.S.C. § 2254(e). Although Chandler suggests that jurors and prospective jurors may have heard media reports about the murders, he does not address any particular seated juror's voir dire, and fails to provide clear and convincing evidence that the jurors empaneled could not be impartial.

While none of the information in the various reports of the Rogers murders was favorable to Chandler, the Court cannot, based on the record, agree with Wilson's characterization of the language employed by the news broadcast media in the Tampa Bay area and Orange County during the period commencing with the discovery of the Rogers murders in 1989 through September 18, 1994, when the jury was sworn and sequestered as "inflammatory" (Dkt. 19, App. C, Vol. 11 at 2044).  Moreover, the fact that certain radio and television stations within the Tampa Bay area that *may* have broadcast into parts of Orange County reported stories concerning the investigation of the Rogers murders and Chandler's arrest and upcoming trial does not, standing alone, establish that the Orange County venire pool was partial.  Just as the Eleventh Circuit opined in *Coleman*, "no one person would have read, for example, all of the newspapers summarized in [the Wilson Reports], or all of the publicity in any single newspaper," *Coleman v. Kemp*, 778 F.3d at 1538, and it is likewise improbable that any one person would have heard or viewed all of the television and radio broadcasts carried over the airwaves in Orange County.

The media coverage related to Chandler's case cited by Wilson spans more than eight years, commencing with the discovery of the bodies on June 4, 1989, and culminating with the Florida Supreme Court's decision affirming Chandler's convictions and death sentence on December 11, 1997.  Materials written or broadcast after the jury was selected are, by definition, not "pretrial publicity" and thus are not relevant to Chandler's claim of "presumed prejudice," particularly so in this case because the jury was sequestered on September 18, 1994.

Chandler fails to establish that Orange County was "saturated" with "inflammatory, prejudicial pretrial publicity" so "pervasive . . . as to render virtually impossible a fair trial by an impartial jury drawn from that community." *Coleman v. Kemp*, 778 F.2d at 1490 (citation omitted).  Having failed to show the requisite actual or presumed prejudice resulting from the pretrial publicity, Chandler's claim that Zinober's failure to file a second motion for a change of venue constitutes deficient performance fails. Counsel is not ineffective for failing to file a frivolous motion.

## B.  Rule 3.850 Evidentiary Hearing

The state courts' determination that Zinober's performance was not deficient is further supported by the testimony given by Zinober and Chandler during the Rule 3.850 evidentiary hearing. Chandler testified that he agreed with the proposal to select a jury from Orange County knowing at the time that he could raise an objection if the Orange County venire pool was deemed partial (Dkt. 19, App. C, Vol. 10 at 1856). Chandler also acknowledged that he discussed the change of venue stipulation with Zinober, and they agreed that while Orange County may not have been the favored county because of the potential publicity that might be generated by a trial on a robbery charge pending against him in neighboring Volusia County, it was better than proceeding to trial with a jury selected

from either the Hillsborough County or Pinellas County venire pool (App. C, Vol. 9 at 1724-25; Vol. 10 at 1743; 1858-59).

Zinober recollected that they conferred extensively during jury selection; Chandler agreed and admitted he had not objected to any individual juror who was selected (Dkt. 19, App. C, Vol. 10 at 1746, 1859-60). The transcript of the jury selection proceedings confirms that Zinober was afforded an opportunity to confer with Chandler before accepting the jury panel (Dkt. 19, App. A, Vol. 86 at 413-14).

Moreover, according to Chandler, he did not want another change of venue after agreeing to accept a jury from Orange County because he did not want any further delays in the trial (Dkt. 19, App. C, Vol. 10 at 1862-63). Zinober communicated Chandler's aversion to further delays to the trial court during the change of venue hearing (Dkt. 19, App. A, Vol. 71 at 12052).  Chandler was informed that if he withdrew from the stipulation and jury selection proved impossible in Hillsborough County, the trial would be moved to another county. The trial judge advised Chandler that according to information she had received from court administrators in other counties, this would likely entail a delay of six to eight weeks or more in getting the case before a jury, depending on the trial court's calendar at the time (Dkt. 19, App. A, Vol. 71 at 12051). During the Rule 3.850 hearing, Chandler testified that he wanted to avoid anything that would involve rescheduling the trial. Chandler made it equally clear to Zinober and the trial court that he did not want to be tried in Hillsborough County.  *Id.*

When Chandler agreed to a trial before an Orange County jury, he also agreed that barring some difficulty in selecting an impartial jury, he would not seek another change of venue (Dkt. 19, App. A, Vol. 71 at 12059-60). During the Rule 3.850 evidentiary hearing, Chandler abandoned his assertion that he did not consent to being tried by an Orange

County jury (Dkt. 19, App. C, Vol. 10 at 1856-58). In his petition, Chandler asserts, instead, that Zinober misled him by convincing him that Orange County jurors could not be avoided. Had Zinober misled Chandler prior to the change of venue hearing about the prospects of securing a change of venue from Orange County if an impartial jury could not be selected there, that misconception was clearly dispelled during the hearing.

Where, as in the present case, the petitioner fails to establish that trial counsel's performance was deficient, his ineffective assistance of counsel claim fails. *See Strickland*, 466 U.S. 687 ("Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable").

## Prejudice

Even if the Court were to accept Chandler's factual allegations regarding the pretrial publicity as true and ignore the trial court's finding that Chandler agreed to being tried with a jury selected from the Orange County venire pool, he would still not be entitled to the relief he seeks because he has not met the prejudice prong of the *Strickland* test. In the post-conviction context, to satisfy the prejudice prong of the *Strickland* test with regard to a venue issue "requires, at a minimum, that [Chandler] bring forth evidence demonstrating that there is a reasonable probability that the trial court would have, or at least should have, granted a motion for change of venue." *Meeks v. Moore*, 216 F.3d at 961. Applying the test applicable in the post-conviction context where a defendant is claiming that counsel was ineffective with regard to a venue issue, the Florida Supreme Court rejected Chandler's claim. *Chandler II*, 848 So.2d at 1036-37 (citing *Meeks v. Moore,* 216 F.3d 951, 961 (11th Cir. 2000) (the petitioner must "bring forth evidence demonstrating that there is a reasonable probability that the trial court would have, or at least should have, granted a

-39-

motion for change of venue if [defense] counsel had presented such a motion to the court."); and *Provenzano v. Dugger*, 561 So.2d 541, 545 (Fla. 1990)). Chandler argues that this is an unreasonable determination of the facts because he was not allowed to present evidence at the evidentiary hearing that would establish that grounds for a venue change from Orange County existed (Dkt. 16 at 25).

As discussed *supra*, Chandler was allowed to supplement the record with the Wilson reports. Although the trial court denied the request for an evidentiary hearing with regard to juror partiality, Chandler's assertion that there was "a lot of publicity" about the murders was accepted as true, and the trial court heard evidence concerning Chandler's venue waiver and Zinober's strategy regarding the venue issue (Dkt. 19, App. C, Vol. 9 at 1579-80; 1637-38). Following an evidentiary hearing, the trial court denied Chandler's Rule 3.850 motion.  The trial court's decision is supported by factual findings that are entitled to a presumption of correctness in this Court absent rebuttal by clear and convincing evidence to the contrary – a burden Chandler has not met.

Chandler's claim is further belied by the ease with which the jury was actually seated. Chandler executed a Change of Venue Election advising the trial court that he wished to change his election of venue pursuant to Fla. Stat. § 910.03 from Hillsborough County to Pinellas County, *see* Dkt. 19, App. C, Vol. 11 at 2076. In granting Chandler's request, the trial court ordered that the jury would be selected from the Orange County venire pool and transported to Pinellas County where it would be sequestered for the duration of the trial (Dkt. 19, App. C, Vol. 11 at 2086-87).

On September 12, 1994, the trial court queried 350 prospective jurors from the Orange County venire pool regarding their willingness to serve on a jury which would be sequestered in Pinellas County to hear a trial anticipated to last four weeks (Dkt. 19, App.

A, Vol. 84 at 3-74). Initially, 44 prospective jurors volunteered to serve.  Before beginning voir dire, 11 prospective jurors requested that they be excused for reasons unrelated to the trial. *Id* at 75-84.  After considering the reasons proffered and conferring with counsel, the trial court excused 7 of the 11 prospective jurors who had requested leave to withdraw, and deferred a decision on the remaining 4 individuals until they had had an opportunity to check with their employers since their concerns were work-related.  *Id.* at 84-91.

After questioning each of the prospective jurors regarding their position on the death penalty, *see* Dkt. 19, App. A, Vol. 84 at 91-145, the trial court recessed.  When the venire returned, 2 of the prospective jurors who had reported that they had work-related concerns informed the trial court that they were prepared to serve on the jury if chosen, and the other 2 prospective jurors were excused for work-related reasons. *Id.* at 146-48.

After conferring with counsel regarding their impressions of the prospective jurors and their responses when queried regarding the death penalty, the trial court excused 2 prospective jurors from the venire pool because they stated that they would not follow the law and impose a death sentence if the aggravating factors outweighed the mitigating factors during the penalty phase of the trial. *Id.* at 150.  Of the remaining 33 prospective jurors, 18 were questioned individually and as a group by counsel and the trial court judge regarding, *inter alia*, whether they had gleaned any knowledge of the case from pretrial publicity, their positions on the death penalty, and their familiarity with the Tampa Bay area. During a bench conference, 2 prospective jurors were eliminated for cause, 1 because of his position on the imposition of the death penalty and 1 due to the nature of the *Williams* Rule evidence the State planned to introduce during the trial.  The State then exercised 4

preemptory challenges, and the defense exercised 2 preemptory challenges.[7]  Although

3 of the 6 jurors challenged had heard "something" about the case,  they were not excused

on this basis, and 2 of the 3 were actually excused at the request of the State (Dkt. 19,

App. A, Vol. 85 at 288-293).  The trial court recessed for the day, with 10 prospective jurors

identified for the panel.

Before reconvening on September 13, 1994, the trial court addressed an additional

200 prospective jurors from the Orange County venire pool regarding their willingness to

serve on a jury which would be sequestered in Pinellas County to hear a trial anticipated

to last four weeks (Dkt. 19, App. A, Vol. 86, 303-09). When the trial court judge finished

explaining the conditions under which the jury would be sequestered, 10 members of the

venire pool indicated their willingness to serve. *Id.* at 308-09.

The trial court judge then reconvened the proceedings and voir dire of prospective

jurors identified the previous day was recommenced.  Of the 10 prospective jurors selected

the previous day, 2 requested that they be excused due to financial hardship (Dkt. 19, App.

A, Vol. 86 at 318).  The requests were granted, and an additional 8 prospective jurors were

brought  into  the  courtroom.  Following  voir  dire,  the  State  exercised  3  preemptory

challenges,  and  the  defense  exercised  2  preemptory  challenges.  At  that  time,  12

prospective jurors had been identified for the jury panel and 1 alternate.  *Id.* at 414-418.

The  5  remaining  members  of  the  venire  from  the  pool  of  350  were  brought  into  the

courtroom, and when voir dire was concluded, the trial court excused 1 juror for cause, and

---

[7]In the Florida courts, each party is allowed 10 peremptory challenges if the offense charged is punishable by death or imprisonment for life.  *See* Fla. R. Crim. P. 3.350(a). When, as in the instant case, alternate jurors are called, "each party is entitled to 1 peremptory challenge, in addition to those otherwise allowed by law, for each alternate juror so called."  Fed. R. Crim. P. 3.350(d).  The additional peremptory challenge can, however, only be used against the alternate juror, and the other peremptory challenges allowed by law cannot be used against the alternate juror.  *Id.*; *see also* Dkt. 19, App. A, Vol. 86 at 416.

both the State and the defense exercised 1 preemptory challenge.  Having succeeded in selecting 12 jurors and 2 alternates, the trial court excused the 1 remaining venire member. *Id.* at 469-70.

The record establishes that none of the prospective jurors excused for cause were excused because of any knowledge of the case.  DeVault and Pittman, the two jurors who indicated during voir dire that they had heard of the case on *Unsolved Mysteries*, stated that they had formed no opinion regarding Chandler's guilt (Dkt. 19, App. A, Vol. 84 at 152-53 (Devault); Vol. 86 at 332 (Pittman)).  Two of the jurors, Carsone and Jones, informed the trial court that they heard a report on the radio that morning that a new system was being used to select Orange County jurors who would then be transported to Pinellas County to serve on a case.  *Id.*  One alternate juror stated that he first learned of the Rogers murders from a television broadcast he viewed while dining in an Ohio restaurant during a visit with his son in 1989.  *Id.* at 333.  He reported that he heard more information regarding the case once he returned to Orlando, but he believed he had heard no more information via the media than he had heard in the trial court's introductory statement of the case.  *Id.* at 334.  In response to questions posed to him/her individually by the trial court and counsel, each juror stated unequivocally that he/she could set aside what was previously heard or read about the case and reach a decision based solely on the evidence presented at trial (*See* Dkt. 19, App. A, Vol. 84 at 153; Vol. 86 at 332, 333).

The record reflects that by the close of the jury selection process, Zinober and Chandler were satisfied with the jury panel (see Dkt. 19, App. A, Vol. 86 at 413-14).  Interestingly, one prospective juror who worked as a local news reporter and morning radio anchor, stated that while she did recall hearing media coverage of the discovery of the bodies and the return of the indictment in the case, the details she recalled were no more

in-depth than the details provided by the trial court in the introductory statement. *Id.* at 333. The responses by the potential jurors during voir dire negate Chandler's assertion that pretrial publicity generated prejudice in Orange County which made it impossible for him to have a fair trial with a jury comprised of Orange County residents.

On federal habeas corpus review of a state conviction, this Court's review is limited to the extent the trial judge's determination of juror impartiality is a finding of fact entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1). *See Patton*, 467 U.S. at 1036-38. Because such a determination is largely one of credibility, and thus demeanor, the finding of the trial court is entitled to "special deference." *Id.* at 1038.

Having considered the record, including the Wilson reports and the articles incorporated therein, each party's argument, applicable statutes, and controlling case law, the Court finds that Chandler has not even come close to the sort of evidentiary showing necessary to establish that his defense was prejudiced by Zinober's failure to file a second change of venue motion. *See Meeks v. Moore*, 216 F.3d at 963. Considering the "totality of the circumstances," *see Coleman v. Kemp*, 778 F.2d at 1491, Chandler has not demonstrated that the pretrial publicity in Orange County was "sufficiently prejudicial and inflammatory" to taint the Orange County venire pool such that he could not receive a fair trial, *see United States v. De La Vega*, 913 F.2d 861, 865 (1990) (quoting *Coleman v. Kemp*, 778 F.2d at 1491).

The state courts' determination that there has been no showing of either deficient performance or prejudice from Zinober's decision not to request a  change of venue from Orange County is a reasonable application of clearly established law, as enunciated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. at 687-89. Chandler has failed to show that the state courts' rejection of this claim relied on erroneous facts, or

that the state courts applied established federal law in a manner that was contrary to, or was objectively unreasonable in light of United States Supreme Court precedent. Additionally, Chandler has failed to meet the burden of overcoming all state court factual findings by clear and convincing evidence. *See* 28 U.S.C. §2254(e). Therefore, habeas relief is not warranted on ground one.

**Ground Two**

Chandler's next claim is that Zinober was ineffective for conceding that he was guilty of a collateral crime without his express authorization. For reasons set forth below, the Court finds that Chandler's argument lacks merit.

Early in the investigation, similarities surfaced between the Rogers murders and the rape of a woman in Madeira Beach. Aware that the State intended to introduce details of the Madeira Beach rape into evidence under the *Williams* Rule, Zinober filed a motion in limine on August 5, 1994, requesting that the trial court exclude any evidence related to that crime (Dkt. 19, App. A, Vol. 44 at 7338-39; Vol. 51 at 8523-8630; Vol. 52 at 8631-8756). The State subsequently filed its Notice of Intent to Use Evidence of Other Crimes, Wrongs, or Acts Committed by Defendant, and following oral argument on August 25, 1994, the trial court entered an order finding that evidence of the Madeira Beach rape was relevant to prove material facts at issue in the Rogers murders, to wit: "any or all of the following: motive, opportunity, intent, plan, or identify" (Dkt. 19, App. A, Vol. 56 at 9457).

The motion to exclude the *Williams* Rule evidence was denied, and during his opening statement, the prosecutor made several references to the Madeira Beach rape. When the prosecutor concluded his opening statement, Zinober requested a side-bar conference during which he moved for a mistrial, asserting that the prosecutor's references to the Madeira Beach rape effectively made the incident "a feature of the case" (Dkt. 19,

App. A, Vol. 87 at 529). The trial court denied the motion, and Zinober, faced with the prospect that the state was going to call Ms. Blair to testify about the Madeira Beach incident, followed the strategy on which he and Chandler had agreed, attempting to defuse the impact of Ms. Blair's testimony during his opening statement. This was Zinober's strategy throughout the trial.

Addressing this issue, the Florida Supreme Court determined that Zinober's strategy was not "outside the realm of reasonably effective assistance of counsel," stating:

> Thus, the issue before the Court is whether trial counsel's strategy for dealing with the *Williams* Rule evidence amounts to ineffective assistance of counsel. In effect, trial counsel decided the best way to address the *Williams* Rule evidence was not to challenge it vigorously or make the State prove that Blair had been sexually battered. Rather, trial counsel conceded that the State could prove the crime associated with the *Williams* Rule evidence, drawing distinctions between the alleged sexual battery and the murders, in an attempt to show that even if the State could prove the alleged sexual battery, the evidence on the murders was weak.[FN 11] Chandler's collateral counsel argues that trial counsel should have vigorously defended against the alleged sexual battery and not conceded anything to the State.[FN 12]
>
> [FN 11] Postconviction counsel, while conceding that trial counsel did not admit guilt to the murders, compares this case to *Nixon v. Singletary*, 758 So. 2d 618 (Fla. 2000), wherein the Court held that defense counsel must have defendant's consent before counsel can make a tactical decision to admit guilt of murder during the guilt phase of a trial in an effort to persuade the jury to spare defendant's life during the penalty phase. *See id.* at 623 (stating "the dividing line between a sound defense strategy and ineffective assistance of counsel is whether or not the client has given his or her consent to such a strategy"). Even though he did not concede guilt to the murders, given the similarities between the murders and the alleged sexual battery, trial counsel's decision should still be closely scrutinized. In effect, trial counsel did concede Chandler's guilt in the Blair case. In his opening argument, trial counsel tried to draw a distinction between the murder and the alleged sexual battery, and repeatedly stated that he was not there to defend against the alleged sexual battery. Finally, in summing up his opening argument, trial counsel stated, "And ladies and gentlemen, in conclusion, the State is going to be able to prove, at least for their case -- okay? -- the State will probably be able to prove to you the Madeira Beach rape. And, again, I ask you to keep that separate." At the evidentiary hearing, Chandler's trial counsel testified that this opening statement was part of the strategy to keep Chandler's Fifth Amendment rights intact and that if he had denied the alleged sexual battery in his opening it might have opened the door to the State to cross-examine Chandler on it.
>
> Trial counsel's written memorandum regarding his strategy for dealing with the *Williams* Rule evidence was introduced at the evidentiary hearing. Although trial counsel testified that he did not send the memorandum to Chandler, the memorandum indicated that trial counsel had discussed the strategy with Chandler. Although Chandler testified that he

had not agreed to trial counsel's strategy, trial counsel testified that he had explained the strategy to Chandler thoroughly and he had agreed. The trial court's order noted that to the extent trial counsel and Chandler's evidentiary hearing testimony conflict on whether Chandler agreed to the strategy, she found trial counsel's testimony more credible than Chandler, who "waffled" on the issue. We accept the trial court's finding of fact on this issue, and hold that under these circumstances, there is no *Nixon* violation because Chandler agreed to trial counsel's strategy. *See Stephens v. State*, 748 So. 2d 1028, 1034 (Fla. 1999) (recognizing trial court's superior vantage point in assessing credibility of witnesses).

FN 12 Chandler had not been tried or convicted for the alleged sexual battery. Sometime after Chandler's conviction on the murders, the State decided not to pursue charges associated with the alleged sexual battery.

Admittedly, on its face, trial counsel's strategy might raise doubts as to its efficacy. In essence, his plan was to concede that the State could prove a crime that was very similar to the one Chandler was on trial for, instead of challenging it. However, our review of the trial court's order and the record from the evidentiary hearing demonstrates that trial counsel's performance in this case was not deficient under *Strickland*. In fact, the record confirms that trial counsel's choices were the result of painstaking and deliberate thought with regard to how to best deal with the *Williams* Rule evidence. Even though collateral counsel disagrees with trial counsel's strategy for dealing with the *Williams* Rule evidence, this disagreement does not place trial counsel's decision on how to deal with the evidence outside the realm of reasonably effective assistance of counsel. *See Occhicone v. State*, 768 So. 2d 1037, 1048 (Fla. 2000) ("Counsel cannot be deemed ineffective merely because current counsel disagrees with trial counsel's strategic decisions."). Furthermore, the fact that trial counsel's tactics did not secure the result defendant wanted does not mean that collateral counsel, who has the benefit of hindsight, can label trial counsel ineffective for failing to use an alternative tactic. *Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."); *see also Cherry v. State*, 659 So. 2d 1069, 1073 (Fla. 1995) ("The standard is not how present counsel would have proceeded, in hindsight . . . ."). This Court has repeatedly stated that "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." *Occhicone*, 768 So. 2d at 1048; *see Shere v. State*, 742 So. 2d 215, 220 (Fla. 1999); *State v. Bolender*, 503 So. 2d 1247, 1250 (Fla. 1987).

Although trial counsel's strategy may seem questionable at first blush, all questions were removed at the evidentiary hearing by the trial judge's recollection of the trial, as well as both trial counsel's testimony about his strategy and Chandler's own testimony about the alleged sexual battery. At the evidentiary hearing, trial counsel gave a well-founded explanation for why

he thought his strategy for dealing with the *Williams* Rule evidence was appropriate. Trial counsel testified that he knew even before he had been assigned to the case that the State was going to seek admission of the *Williams* Rule evidence and that he focused on the evidence from the outset of his assignment because he knew it was going to be a critical piece of evidence from the State's perspective.[FN 13]

> [FN13] In written closing arguments that were submitted after the evidentiary hearing, collateral counsel conceded that trial counsel's pretrial motion in limine to exclude the *Williams* Rule evidence was well-researched and that trial counsel "cannot be faulted for the effort he made in this regard."

*Chandler II*, at 1040-42.

As discussed *supra*, in addressing an ineffective assistance of counsel claim, a federal habeas court is not bound by the state court's finding on the Sixth Amendment claim because this is a mixed question of law and fact, but it is bound by the underlying findings of fact. Chandler has not rebutted by clear and convincing evidence the trial court's finding that he agreed to Zinober's strategy (Dkt. 19, App. C, Vol. 11 at 2066).

While Chandler admitted on appeal that Zinober did not actually concede guilt regarding the Rogers murders, he contended that Zinober "came too close to doing exactly that" effectively resulting in there being "no strategy at all" to counter the *Williams* Rule evidence (Dkt. 19, App. C, Vol. 15 at 60-61, 63). In the memorandum of law filed in support of his petition, Chandler argues that any time trial counsel concedes the client's guilt without the client's express consent, he is, *per se*, ineffective. As legal support for this argument, Chandler cites the Florida Supreme Court's decision in *Nixon v. Singletary*, 758 So. 2d 618 (Fla. 2000), opining that "[w]e cannot envision a situation more damaging to an accused than to have his own attorney tell the jury that there is no reasonable doubt that his client was the person who committed the conduct that constituted the crime charged in the indictment" (Dkt. 16 at 29). Chandler's reliance on *Nixon* is undercut by the United States Supreme Court's reversal of that decision, holding that:

> When counsel informs the defendant of the strategy counsel believes to be
> in the defendant's best interest . . . counsel's strategic choice is not impeded
> by any blanket rule demanding the defendant's explicit consent. Instead, if
> counsel's strategy, given the evidence bearing on the defendant's guilt,
> satisfies the *Strickland* standard, that is the end of the matter; no tenable
> claim of ineffective assistance would remain.

*Florida v. Nixon*, 543 U.S. 175, 125 S.Ct. 551, 563 (Dec. 13, 2004). Secondly, the Florida

Supreme Court affirmed the trial court's finding that Chandler agreed with counsel's

decision to admit guilt on the collateral crime. State court factual findings are subject to a

presumption of correctness under 28 U.S.C. § 2254(e)(1) and must be accepted by the

federal courts on habeas review, unless the petitioner demonstrates by clear and

convincing evidence that they are incorrect, see *Williams I,* 529 U.S. at 412-413, a burden

that Chandler has failed to carry. *See* § 2254(e)(1).

The state courts' finding in this regard is supported by the record. During the Rule

3.850 evidentiary hearing, Chandler acknowledged that Zinober told him that in his

professional opinion it would not be a good strategy to defend the rape charge during the

murder trial, and Chandler agreed (Dkt. 19, App. C, Vol. 10 at 1866-67).

In the instant case, Zinober did not abandon the interests of his client. *See Bell v.

Quintero*, __ U.S. __, 125 S.Ct. 2240, 2241, 161 L.Ed.2d 506 (Mar. 21, 2005) ("[F]or a court

to 'presum [e] prejudice based on an attorney's failure to test the prosecutor's case, . . . the

attorney's failure must be complete.") (quoting *Bell v. Cone*, 535 U.S. at 697, and citing

*Florida v. Nixon,* 543 U.S. 175, 125 S.Ct. at 561-562). To the contrary, faced with what he

believed was irrefutable evidence of guilt in regard to the Madeira Beach rape, Zinober

zealously defended Chandler at each stage of the proceedings. He questioned the venire

extensively for prior knowledge and bias. Although Zinober admitted during his opening

statement that Chandler was on the boat with Ms. Blair, Zinober then cautioned the jury

that while they would hear evidence from the State regarding the Madeira Beach rape, Chandler was not on trial for that crime.  Zinober informed them that he would refrain from any attempt to rebut the State's evidence regarding the rape charge because he was there to defend Chandler on the murder charges.  Zinober stated that Chandler was innocent of the charged offense, and he was confident that the State would not be able to produce sufficient evidence to support a finding of guilt beyond a reasonable doubt on the murder charges.  During the trial, Zinober cross-examined the State's witnesses vigorously, made numerous motions and objections, and provided a strong closing argument.

Where, as here, the state court's application of governing federal law is challenged, it must be shown to be not only erroneous, but objectively unreasonable.  *Wiggins v. Smith*, 539 U.S. at 520; *Woodford v. Visciotti*, 537 U.S. at 24-25; *Williams I*, 529 U.S. at 409.  Chandler has not shown either that there was an erroneous application of *Strickland* or that the state court's application of the *Strickland* standard was objectively unreasonable.

Zinober believed that he was faced with irrefutable evidence that Chandler had sexually battered Ms. Blair and that to attempt to refute that evidence during the murder trial would raise issues of credibility which did not favor Chandler. Zinober testified that given the impression Ms. Blair made during her deposition, in his professional opinion an attempt to defend the Madeira Beach rape charge would have seriously undermined Chandler's credibility as a witness. Zinober did not want Chandler placed in a position which could have resulted in Chandler testifying that he "did not stop having sex with Blair after she demanded that he stop because 'he wanted to complete the act' and in his opinion he 'was entitled to finish.'" *Chandler II*, at 1043.  As the trial court found, this "would have been devastating for the jury to see and hear in the murder trial" (Dkt. 19, App. C, Vol. 11 at 2066).

"Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment." *Strickland*, 466 U.S. at 681.   The record reflects that Zinober conducted substantial investigation before concluding that any attempt to defend the Maderia Beach rape charge during the murder trial would prove more harmful than helpful to Chandler. Applying the *Strickland* standard, Zinober's performance cannot be said to have been objectively unreasonable under prevailing professional norms.

Chandler fails to establish that the state court's adjudication of this claim was contrary to or an unreasonable application of clearly established Federal law or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. Additionally, Chandler has failed to meet the burden of overcoming the state court's factual determinations by clear and convincing evidence.  *See* 28 U.S.C. §2254(e).  Having failed to make the necessary showing, Chandler has not demonstrated that he is entitled to federal habeas relief on this claim.

**Ground Three**

The Fifth Amendment provides, in relevant part, that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. 5. When questioned about the Madeira Beach rape during cross-examination, Chandler repeatedly invoked his Fifth Amendment right against self-incrimination. Chandler asserts that had Zinober not admitted during his opening statement that the State would be able to prove the Madeira Beach rape, he would not have had to invoke the Fifth Amendment to avoid questions about the incident during cross-examination. Chandler also argues that Zinober was ineffective for failing to object to a series of questions about the Madeira Beach rape

proffered by the State, rendering the issue procedurally barred under state law.   In

addressing this claim, the Florida Supreme Court stated that:

> Moreover, trial counsel also noted that it was decided early on that Chandler should testify on his own behalf in the defense portion of the case.[FN 14] Trial counsel realized that even if the trial court ruled against Chandler on a motion in limine to prevent the  introduction of the *Williams* Rule evidence, the alleged sexual battery case would still be pending when the State brought the murder to trial. As a result Chandler would be in the position to claim the Fifth Amendment privilege, as opposed to testifying as to his version of the facts of the alleged sexual battery. Therefore, as part of his comprehensive strategy to deal with the *Williams* Rule evidence, trial counsel wanted to make it clear to the jury that the alleged sexual battery was a different case and that "we were not going to defend it in the homicide case; that we were going to let the State prove whatever they wanted to prove on that, and we were not going to defend that case for many reasons."

>> [FN 14] In addition to the fact that Chandler wanted to testify, trial counsel, who had participated in eleven other capital cases and had results favorable to the defendant in a number of them, said based on his experience with the cases where he had been successful, he thought it was important for Chandler to testify at trial.

> At the evidentiary hearing, trial counsel also testified that having Chandler deny the alleged sexual battery on the stand would have been detrimental to Chandler's defense of the murder. Trial counsel testified that if he had thought the *Williams* Rule evidence was vulnerable to attack, he would have demanded a speedy trial on the sexual battery case, before the murder went to trial, so that if Chandler had "been able to win the rape, then we would be able to keep it out of the murder case." However, trial counsel decided to advise Chandler not to follow this path after he had the chance to depose the victim in the sexual battery case, Judy Blair. Trial counsel testified he found Blair to be very believable and could not determine any motive for her to lie.[FN 15] Trial counsel found Chandler's claim that he had consensual sex with Blair more difficult to believe, he was concerned about giving the prosecution the opportunity to cross-examine Chandler on his story, and he was concerned that under the facts of Chandler's story alone, the jury would still be able to come to the conclusion that Chandler was admitting to sexual battery. Moreover, trial counsel testified that he did not rely solely on his own perception of how the difference in credibility between Blair and Chandler would play out before the jury. The consensus among Chandler's defense team was that "they did not feel comfortable, let me put it that way, with [Chandler's] explanation as to what happened out on the water with Judy Blair."

>> [FN 15] Because there was no question of identity in the alleged sexual battery case, the only defense available to Chandler was that he had consensual sex with Blair. At the evidentiary hearing, trial counsel testified at length about his perception of Blair's

> credibility and appearance. Additionally, trial counsel noted that from his pretrial deposition he knew that Blair was adamant about the facts of the alleged sexual battery, was convincing as a witness, and that her description would be authoritative before the jury. In summing up his thoughts, trial counsel stated, "If they were ever going to make a mold of what the State wants to bring to court for a rape victim, that mold is going to be this lady. It's going to be Judy Blair."

Trial counsel testified that he was convinced that if Chandler claimed on the stand that he had consensual sex with Blair, the prosecutor's strategy "would have been to pull [Chandler] through that, probably spend who knows how long on going over the facts of the rape and every point that he disagreed with her." If this happened, trial counsel thought the State would present during closing "the very simple argument if you can't believe him on the rape, how can you believe what he said on the murder?" Recognizing that Chandler was going to testify and wanted to testify, trial counsel said that it was critical that Chandler's credibility be preserved, but he testified that in his opinion, pitting Chandler's credibility against Blair's would have been "suicidal to his chances of winning the murder case." Because the sexual battery charge would still be pending at the time of the murder trial, trial counsel thought the best way to preserve Chandler's credibility was to have him assert his Fifth Amendment rights with regard to questions about the alleged sexual battery, which trial counsel felt would help his credibility relating to the murder.

Trial counsel's fears about Chandler's  version of events were supported by Chandler's testimony at the evidentiary hearing. During cross-examination, Chandler admitted within the context of his version of events that he did not stop having sex with Blair after she demanded that he stop because "he wanted to complete the act" and in his opinion he "was entitled to finish." The trial court made an apt observation about Chandler's evidentiary hearing testimony:

> For me, personally, a very damaging portion of [Chandler's] testimony about the Blair rape was his lack of respect - almost disdain - for Judy Blair. Having sat through the murder trial, it was extremely difficult to imagine anyone having such hatred/disdain for women that he could have done what was done to the Rogers women. Mr. Chandler let some of that part of his personality appear when he testified about the Blair rape. This would have been devastating for the jury to see and hear in the murder trial.

> I conclude this part of the order convinced that [trial counsel's] strategy was correct as to his handling of the entire *Williams* Rule issue, including conceding in his opening statement that the state could prove the rape, as he was not there to defend it, but was going to defend the murder charge.

We agree with the trial court's characterization of Chandler's evidentiary hearing testimony. Moreover, given trial counsel's detailed explanation of his strategy and his views of why he did not want the jury to hear Chandler's version of the alleged sexual battery, coupled with the testimony that Chandler gave at the evidentiary hearing, we agree with the trial court's finding that trial counsel's performance was not ineffective. Thus, while trial counsel's handling of this issue may have differed from collateral counsel, trial counsel's strategic decisions under these circumstances do not amount to ineffective assistance of counsel. We affirm the trial court's denial of relief on this claim.

*Chandler II*, at 1040-1044.

First, the assertion that Zinober was ineffective for permitting "Chandler to allude to the Blair incident (albeit briefly), on direct when testifying about a conversation that he (Chandler) had with his daughter, Kristal Mays," misstates the record. It was, in fact, during cross-examination that the <u>prosecutor</u> asked Chandler whether he was contradicting his daughter's testimony that he admitted being accused of rape and murder and, in fact, admitted to her that he committed the murder.  Zinober objected to the question, asserting the Fifth Amendment privilege against self-incrimination.  Before the trial court judge could rule on the objection, Chandler responded that he was "[n]ot here to talk about the rape trial. Okay?"  Zinober's objection was then overruled.

Without invoking his Fifth Amendment privilege, Chandler again refused to respond to the prosecutor's questions about the Madeira Beach incident. Zinober objected again on grounds of privilege. His objection was again overruled. The prosecutor then asked Chandler if he was refusing to answer because he was afraid his answers might be "incriminat[ing]." Chandler responded "[p]ardon me?" Zinober then objected to the prosecutor's question on grounds that it was "asked and answered," and advised the trial court that Chandler was invoking his Fifth Amendment privilege.  The trial court informed Zinober that Chandler must invoke the privilege himself. Chandler then invoked his Fifth

Amendment privilege, informing the prosecutor that he would not answer any questions related to the Madeira Beach rape. When asked whether he believed that his answer would be self-incriminating, Chandler responded, "[n]o." The prosecutor then advised Chandler that if he did not believe the answer would be self-incriminating, he could not assert a Fifth Amendment privilege not to respond to the questions.

The trial court judge confirmed the prosecutor's statement, and Zinober informed the trial court that Chandler did not wish to talk about the Madeira Beach case.  The trial court informed Chandler that he must either answer the question or invoke his Fifth Amendment privilege, whereupon, Chandler responded, "I invoke the Fifth Amendment."  *See* Dkt. 19, App. A, Vol. 98 at 2200-201.

Chandler argues that he did not choose to testify and that "all of this could have been avoided if defense counsel [] had met with the defendant prior to trial to determine whether he would testify and, if the decision was that he would, prepare him for that testimony" (Dkt. 16 at 34). Chandler contends that "under no circumstances should [Zinober] have advised [him] to assert the Fifth Amendment privilege.  Instead, Chandler, . . . should have been advised to answer the prosecutor's questions and deny any culpability."

As discussed *supra*, during the Rule 3.850 evidentiary hearing, Zinober and Chandler testified about Chandler's decision to testify and the defense strategy in light of the trial court's ruling that the State could introduce testimony regarding the Madeira Beach case.  Zinober testified that he recalled spending a good deal of time discussing the case with Chandler  (Dkt. 19, App. C, Vol. 10 at 1754-56; 1778).  Zinober testified that he did not rehearse Chandler's answers with him, having found from experience that the loss of spontaneity affected the jury adversely.  According to Zinober, he reviewed with Chandler

the questions he would ask, and they discussed how Chandler would respond to questions on cross-examination (Dkt. 19, App. C, Vol. 10 at 1778-80).

Chandler agreed that he discussed many things about the case with  Zinober, including whether he would testify and the State's invocation of the *Williams* Rule to bring in testimony about the Madeira Beach rape. Chandler further testified that he vacillated about testifying and admitted that he knew he did not have to testify (Dkt. 19, App. C, Vol. 10 at 1883).

Chandler then related what occurred during the Madeira Beach incident from his perspective, as he had done with Zinober pretrial (Dkt. 19, App. C, Vol. 10 at 1812-21). According to Chandler, he did not authorize Zinober to admit his guilt of the Madeira Beach rape (Dkt. 19, App. C, Vol. 10 at 1822). Chandler testified that on the evening in question he had sexual relations with Ms. Blair on the boat, but continued to maintain that he had a right to complete the act after Ms. Blair began to resist (Dkt. 19, App. C, Vol. 10 at 1843-49).  Chandler testified he would have preferred to testify about the rape charge rather than invoke his Fifth Amendment privilege against self-incrimination because he believed that in doing so he appeared to be admitting his guilt to that charge (Dkt. 19, App. C, vol. 10 at 1822).  He described his reaction to the prosecutor's questioning as one of anger each time he was forced to respond by asserting his Fifth Amendment privilege (Dkt. 19, App. C, Vol. 10 at 1826-27).

Chandler further testified that he had expected Zinober to tell the jury that they were not defending the rape case (Dkt. 19, App. C, Vol. 10 at 1870). Chandler stated that he was not concerned with Zinober's concession in his opening statement that the State could prove beyond a reasonable doubt that he was the one on the boat with Ms. Blair (Dkt. 19, App. C, Vol. 10 at 1872).  Chandler acknowledged that he knew Zinober was trying to keep

the State's evidence about the Madeira Beach rape out of the murder trial because the State intended to use it to demonstrate similarities between the rape and the murders, establishing the identity of the murderer as the rapist (Dkt. 19, App. C, Vol. 10 at 1875-76). Chandler asserted, however, that Zinober did not discuss whether he should invoke the Fifth Amendment rather than give his version of the sexual encounter with Ms. Blair (Dkt. 19, App. C, Vol. 10 at 1866; 1868-69; 1876-77).

According to Chandler, he wanted to testify to discredit some of the State's witnesses and to deny Ms. Blair's allegations (Dkt. 19, App. C, Vol. 10 at 1831). Although Chandler admitted that he knew it was his decision whether to testify, he then asserted that he was merely going along with "Zinober's decision" because he had heard Zinober tell the jury in opening statement that Chandler would testify (Dkt. 19, App. C, Vol. 10 at 1882-84). Chandler acknowledged that he and Zinober discussed the strategy of not defending the Madeira Beach rape case and admitted that he had agreed with the strategy (Dkt. 19, App. C, Vol. 9 at 1666; Vol. 10 at 1866-67, 1881-82). According to Chandler, he invoked his Fifth Amendment privilege because he wanted to go to trial on the rape charge later (Dkt. 19, App. C, Vol. 10 at 1866).

Zinober testified that he was aware that Chandler believed that he and Ms. Blair had consensual sex (Dkt. 19, App. C, Vol. 9 at 1667), and he knew that Chandler had not confessed to the rape (Dkt. 19, App. C, Vol. 9 at 1669-70). Zinober also testified that neither he nor his staff thought that the jury would accept Chandler's version of events at Madeira Beach  (Dkt. 19, App. C, Vol. 9 at 1687; Vol. 10 at 1766).  According to Zinober, he believed Ms. Blair was an extremely credible witness, and it would have been suicidal for Chandler, a six-time convicted felon whose physical appearance reflected the effects

of having been incarcerated for nearly two years awaiting trial, to engage in a head-to-head contest of credibility with her (Dkt. 19, App. C, Vol. 9 at 1687-89; Vol. 10 at 1695).

Chandler's testimony during the Rule 3.850 evidentiary hearing gives credence to Zinober's concerns.  Even though it was more than 10 years after the incident occurred, when questioned regarding the rape, Chandler was unable to mask his contempt for the victim during the Rule 3.850 evidentiary hearing,  volunteering derogatory comments about her appearance and character.  In answers generally unresponsive to the questions asked, Chandler described Ms. Blair as profane, sleazy, drunk, loud, provocatively dressed, and promiscuous. According to Chandler, he concluded within minutes of meeting her that Ms. Blair was "one you could sleep with" (Dkt. 19, App. C, Vol. 10 at 1813-26; 1836).

The transcripts of the evidentiary hearing evince a witness who was evasive and accusatory when testifying about the rape victim. It is clear that Zinober's concerns regarding Chandler's credibility when testifying about the Madeira Beach rape were warranted. Rather than supporting a claim of ineffective assistance of counsel, Chandler's testimony concerning the Madeira Beach rape confirms the reasonableness of the defense strategy.

As previously noted, both the trial court and the Florida Supreme Court considered Chandler's argument that Zinober was ineffective for advising him to assert his Fifth Amendment privilege rather than answer the prosecutor's questions and deny any culpability. Having considered Chandler's argument and the supporting testimony, the trial court found that having Chandler deny the sexual battery and testify as to his version of the facts have been a mistake. The Florida Supreme Court concluded that Chandler's testimony regarding his encounter with Ms. Blair "would have been devastating for the jury to see and hear in the murder trial." *Chandler II*, 848 So. 2d at 1043-44.  As Respondent

points out, it was actually a defense victory that Chandler was not compelled to answer the

questions since it was the defense that wanted Chandler to avoid testifying about the

Madeira Beach rape, not the State. Tellingly, having presided over the trial with the

opportunity to observe both Ms. Blair and Chandler testify, the trial judge stated during the

Rule 3.850 evidentiary hearing:

> What about this strategy?  Actually it was very ingenious.  Zinober managed
> to preserve for appeal the issue of Chandler being required to take the 5th,
> and still preserve his main strategy -- over the state's objection -- of not
> having Chandler pit his credibility against Blair's credibility in front of the jury,
> which Zinober believed would be "suicidal to his chances of winning the
> murder case...."  (T. 39, 50, 146).
>
> . . . . .
>
> There was a third benefit to this strategy, and that was creating a novel, and
> what Mr. Zinober considered a "good appellate issue", which Mr. Zinober still
> considers a good issue for Chandler's Federal appeal, even though rejected
> by the Florida Supreme Court.  (T. 59-60; 130-131; 146-147; 150-151).  I will
> agree that this was one of the most unusual rulings I have made in my 20
> years on the bench.  It was raised the night before Chandler testified, and by
> the next day, the state had found no law on point (and there still may be none
> except for the Florida Supreme Court's opinion on this case).
>
> The state's position was if Chandler testified, I should require him to answer
> questions about the rape.  They knew he was going to deny the rape.  They
> wanted him to pit his credibility against Judy Blair's.  The defense strategy
> was to avoid this at all costs, even if it meant a contempt hearing for refusing
> to answer if I had done what the state wanted and required Chandler to
> answer.  And so the defense had another proposition, allow Chandler to take
> the 5th Amendment.  This allowed them to preserve the issue for appeal (I
> shouldn't have allowed the state to ask any questions about the rape), and
> to accomplish their main objective -- not having Chandler pit his credibility
> against Blair's.
>
> In retrospect, I should have indeed compelled defendant to answer the
> state's questions.  I had ruled, in allowing the *Williams* Rule testimony in the
> first place, that it was a relevant to prove the murder.  Once defendant denied
> committing the murder, the state should have been allowed to pursue, on
> cross, his explanation of the entire boat trip with Judy Blair.  In essence, by
> my ruling, I allowed the defense to pull a ruse -- take the 5th Amendment,
> allowing the jury to infer if I had compelled his answers he would have
> incriminated himself as to the rape, when in fact he would have incriminated

himself as to the murder.  His attorney felt that if the jury thought he lied about the rape, they would think he was lying about the murder.  (T. 139-143), 147-149).  He had no 5th Amendment right as to the murder once he took the stand.  By my incorrect ruling, brought on by the defense strategy, I assisted the defense, at their request, and with Chandler's consent.  How can Zinober's strategic decision be challenged.  In retrospect, it borders on brilliance.

Dkt. 19, App. C, Vol. 11 at 2062-63.

As Chandler contends, had Zinober objected to the prosecutor's questions as outside the scope of direct, the claim would have been preserved for direct appeal; however, as evidenced by the following excerpt from the Florida Supreme Court's decision on direct appeal, this claim is unavailing:

As to Chandler's claim regarding the prosecutor's questions about the Blair rape, we believe that this issue constitutes a classic case of trying to take the wind out of your opponent's sails by preemptively admitting extremely prejudicial evidence and thereby softening the blow.  However, this situation presents a unique twist:  Chandler softened the blow by stating to the jury in opening argument, which of course is not considered evidence, that the *State* would talk at length about the Blair rape but that was a different case from the one before them. Thereafter, when the time came, defense counsel did not allude to the Blair rape during his direct examination of Chandler.  In that way, the State presumably could not address that subject matter when cross-examining Chandler since the issue was not broached on direct examination. *See Hunter v. State,* 660 So.2d 244, 251 (Fla. 1995) (finding trial court did not err in limiting attempted cross-examination of police detective which was "clearly outside the scope of direct"); § 90.612(2), Fla. Stat. (1993) (limiting cross examination "to the subject matter of direct examination and matters affecting the credibility of the witness . . . [although the] court may, in its discretion, permit inquiry into additional matters").

Nevertheless, Professor Ehrhardt has noted that:

All witnesses who testify during a trial place their credibility in issue. Regardless of the subject matter of the witness' testimony, a party on cross- examination may inquire into matters that affect the truthfulness of the witness' testimony.  Although cross-examination is generally limited to the scope of the direct examination, the credibility of the witness is always a proper subject of cross-examination.   The credibility of a criminal defendant who takes the stand and testifies may be attacked in the same manner as any other witness.

-60-

Charles W. Ehrhardt, *Florida Evidence* § 608.1 at 385 (1997 ed.) (footnotes omitted).  *See also Shere v. State,* 579 So.2d 86, 90 (Fla. 1991) (recognizing the general rule that the "purpose of cross examination is to elicit testimony favorable to the cross-examining party ... and to challenge the witness's credibility when appropriate").   Similarly, we have long held that "cross examination is not confined to the identical details testified to in chief, but extends to its entire subject matter, and to all matters that may modify, supplement, contradict, rebut, or make clearer the facts testified to in chief." *Geralds v. State,* 674 So.2d 96, 99 (Fla. 1996) (quoting *Coco v. State,* 62 So.2d 892, 895 (Fla. 1953)); *Coxwell v. State,* 361 So.2d 148, 151 (Fla. 1978) (same).

In *Geralds,* we recently denied a similar claim from the defendant that the prosecutor's cross-examination about evidence linking him to the murder was beyond the scope of the defendant's testimony on direct.  674 So.2d at 99-100.   We noted that on direct examination, the defendant's testimony covered six general subjects, including his denial that he murdered the victim. *Id.* at 100.   Since the defendant opened the door on that subject, we concluded that the trial court did not abuse its discretion in allowing questions about evidence linking the defendant to the crime.  *Id.*

Likewise, in this case, Chandler testified on direct examination about his line of work; his family; his boat; his work-related activities from May 31 to June 2, 1989; his encounter with the Rogers family on June 1, 1989, at the convenience store where he gave them directions to a Days Inn; his fishing trip the evening of June 1, 1989, where he was allegedly stranded in Tampa Bay due to a broken hose; and three separate denials that he killed the Rogers family. The crux of Chandler's defense was that he met Michelle Rogers only briefly at the convenience store where he gave her directions to a Days Inn; he did not take the Rogers family for a cruise that night; and he did not kill them. We conclude that the State could legitimately attack Chandler's credibility in asserting those claims, *Geralds,* and could permissibly develop the connection between the Blair rape and the Rogers' murders to that end.

*Chandler v. State*, 702 So. 2d 186, 196 (Fla. 1997) (footnotes omitted). Thus, the Florida

Supreme Court found on direct appeal that since Chandler testified that he told his

daughter he was innocent of both the rape and the murders, this was a legitimate subject

of inquiry for the State in cross-examining Chandler as it attempted to cast doubt on his

defense and undermine his credibility as a witness. *Id.* at 197.

This Court agrees with the state courts' decision that Chandler has not met *Strickland*'s two-prong test. Zinober's advice that Chandler avoid questions regarding the Madeira Beach rape, when assessed in light of the information known at the time, was well within the bounds of objectively reasonable professional norms.

Chandler has failed to show that the state courts' adjudication of this claim resulted in a decision that is contrary to or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254. Chandler has also failed to rebut the presumption of correctness accorded the state court's factual findings by clear and convincing evidence. *See* 28 U.S.C. §2254(e). The claim is, therefore, meritless.

**Ground Four**

In this claim, Chandler asserts that Zinober's performance was deficient because he failed to object to statements made by the prosecutor during closing arguments (Dkt. 1 at 46; Dkt. 16 at 36). This claim was raised and rejected by the state courts in Chandler's Rule 3.850 proceedings.

In considering a claim that the prosecutor's comments to the jury during closing argument violated the petitioner's right to a fair trial, federal habeas corpus review is "the narrow one of due process, and not the broad exercise of supervisory power." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974). To amount to a constitutional violation, the prosecutor's remarks must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 644. Such an egregious event did not befall Chandler. Federal case law regarding closing statements is the same as Florida law, *see e.g., Darden v. Wainwright*, 477 U.S. 168, 179-183 (1986) (quoting *Donnelly v.*

*DeChristoforo,* 416 U.S. at 643). For reasons set forth below, the Court finds that the state courts' determination that this claim lacks merit is supported by the record.

In its order rejecting this claim, the Florida Supreme Court stated as follows:

Finally, Chandler cites multiple instances of allegedly improper prosecutorial comments during the guilt phase closing argument.[FN 16] He asserts that trial counsel's failure to object to these comments constituted prejudicial error. In denying his claim, the trial court found that Chandler's claim failed for several reasons: (1) any improper remarks of the prosecutor were not sufficient to undermine confidence in the outcome of the case, and therefore, Chandler could not meet the prejudice prong of *Strickland*; (2) trial counsel explained at the evidentiary hearing why he did not object to many of the remarks made during the prosecutor's closing statement, and, in essence, Chandler could not meet the deficiency prong of *Strickland*; and (3) many of the specific statements raised by the defendant as objectionable were actually proper and permissible.

> [FN 16] Chandler organizes the numerous allegedly improper comments into four broad categories: (1) improper comments on Chandler's exercise of his Fifth Amendment privilege regarding the alleged sexual battery; (2) improper attacks on defense counsel and his theory of the case; (3) improper statements of the prosecutor's personal opinions and beliefs; and (4) improper personal attacks on Chandler.

We agree with the trial court's finding that many of the specific statements raised by the defendant as objectionable were actually proper and permissible. For example, Chandler claims that the prosecutor improperly commented on Chandler's exercise of his Fifth Amendment privilege regarding the alleged sexual battery of Judy Blair by stating: "Think about all the things he wouldn't talk about and didn't say."[FN 18] Taken in context, we do not believe that this brief comment by the prosecutor was an unfair or improper comment on defendant's Fifth Amendment rights. In *Dabney v. State,* 119 Fla. 341, 161 So. 380 (1935), the Court stated:

> [FN 18] Although trial counsel did not contemporaneously object to this statement by the prosecutor, he did subsequently object following another remark by the prosecutor arguing that he was again "commenting on the Defendant's exercise of [his] Fifth Amendment privilege." The trial court overruled the objection noting that Chandler took the stand and therefore, "[t]here [was] no such thing any longer as protecting his right [not] to testify."

The settled rule is that if a defendant declines to become a witness in his own behalf, then the prosecuting attorney shall not comment on such course being taken by the defendant. In other words, the failure of the defendant to testify cannot be taken or considered as any admission against his interest; but, if a defendant voluntarily takes the stand and testifies as a witness in his own behalf, then he becomes subject to cross-examination as any other witness, and the

prosecuting officer has the right to comment on his testimony, his manner and demeanor on the stand, the reasonableness or unreasonableness of his statements, and on the discrepancies which may appear in his testimony to the same extent as would be proper with reference to testimony of any other witness.

*Id.* at 381.[FN 19] Similarly, Chandler argues that a number of isolated and out-of-context statements were improper. In the statements cited, the prosecutor used words and phrases such as "desperation, distortion, and half-truths," "charade," and "totally irrational" to characterize defense counsel's arguments as misleading. Although some of the descriptions by the prosecution may have been poorly chosen and more harsh than necessary, the statements were made in reference to defense claims that the prosecutor felt were legally or factually inaccurate or logically inconsistent. Therefore, even if these statements were poorly expressed, they were not improper.

[FN 19] *Cf. United States v. Weber,* 437 F.2d 327 (3d Cir. 1970).  In *Weber,* the Third Circuit, in an admittedly different context, stated:

> [O]nce a defendant takes the witness stand he waives his Fifth Amendment privilege and makes himself liable to cross-examination as an ordinary witness. Moreover, it is permissible, even in a trial upon a multi-count indictment, for the court to charge that a jury may draw an inference of guilt from a defendant's silence when the defendant testifies as to some facts, but refrains from testifying as to other facts within his knowledge.  Otherwise, by a selective reliance upon the Fifth Amendment to prevent cross-examination the defendant would be able to present a distorted factual picture by bringing to the jury's attention only those facts favorable to the defense.

*Id.* at 334-35 (citations omitted).

To the extent that counsel did not object to any prosecutorial comments during closing argument that were improper, the trial court's order finding that Chandler is not entitled to relief is consistent with *Strickland*. In *Strickland*, the United States Supreme Court stated:

> Because of the difficulties inherent in making the evaluation [of ineffectiveness], a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 100 L. Ed. 83, 76 S. Ct. 158 (1955)). *See also Ventura v. State*, 794 So.2d 553, 568 (Fla. 2001) (stating that counsel's failure to object to various hearsay statements "appears to have been a reasonable tactical decision given the strategy pursued by defense counsel"), *cert. denied*, 535 U.S. 1098, 122 S. Ct. 2296, 152 L. Ed. 2d 1054 (2002). We agree that the

decision not to object to improper comments is fraught with danger and may not be wise strategy because it might cause an otherwise appealable issue to be considered procedurally barred. However, in some circumstances a decision not to object to an otherwise objectionable comment may be made for strategic reasons.[FN 20]

> [FN 20] In the instant case, while he did object to some comments, trial counsel alleged that his failure to object to every improper comment made by the prosecutor was a strategic decision. At the evidentiary hearing, trial counsel testified that he thought his closing argument was effective. Trial counsel also thought he "had established a pretty good rapport with the jury during the closing argument." Trial counsel also stated, "in general I don't like to jump up all the time anyway. I think it looks bad in front of the jury when you're continually jumping up and interrupting the other side's closing argument." Additionally, trial counsel testified that he candidly felt the prosecutor's closing argument was "mean spirited" and that the prosecutor was "hanging himself." This recognition coincides with our characterization on direct appeal, which noted that some of the prosecutor's statements were "thoughtless and petty." *Chandler,* 702 So.2d at 191 n. 5.

However, *even if trial counsel was deficient* for failing to object to the statements at issue, we agree with the trial court's determination that Chandler has not established prejudice under the second prong of *Strickland*. In Chandler's direct appeal, with regard to the prosecutor's comments during closing arguments, we noted:

> The prosecutor's comment that Chandler never told his daughters or son-in-law that he was innocent was a fair characterization of the evidence, while his other comments about Chandler and his counsel were thoughtless and petty, e.g., counsel engaged in "cowardly" and "despicable" conduct and Chandler was "malevolent . . . a brutal rapist and conscienceless murderer," but not so prejudicial as to vitiate the entire trial. *Esty v. State*, 642 So.2d 1074, 1079 (Fla. 1994); *Bertolotti v. State*, 476 So.2d 130 (Fla. 1985).

*Chandler*, 702 So. 2d at 191 n.5. Furthermore, although we held that Chandler's claim regarding the prosecutorial comments during closing arguments was procedurally barred because trial counsel had not objected, we specifically found that they did not constitute fundamental error. *Chandler*, 702 So. 2d at 191. In *Spencer v. State,* 842 So.2d 52 (Fla. 2003), we recently explained:

> In order for an error to be fundamental and justify reversal in the absence of a timely objection, "the error must reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." *Brown v. State,* 124 So.2d 481, 484 (Fla. 1960); *see also State v. Delva,* 575 So.2d 643, 645 (Fla. 1991). In order for improper comments made in the closing arguments of a penalty phase to

constitute fundamental error, they must be so prejudicial as to taint the jury's recommended sentence.

*Id.* 842 So.2d at 74. Because Chandler could not show the comments were fundamental error on direct appeal, he likewise cannot show that trial counsel's failure to object to the comments resulted in prejudice sufficient to undermine the outcome of the case under the prejudice prong of the *Strickland* test. *See Strickland*, 466 U.S. at 694.

The instant case is similar to *Thompson v. State,* 759 So.2d 650, 664  (Fla. 2000), in which the defendant claimed defense counsel was ineffective for failing to object to several improper remarks by the prosecutor.  This Court stated that "[b]ecause none of these prosecutorial comments would have constituted reversible error had they been objected to at trial, we affirm the trial court ruling summarily denying this claim." *Id.* at 664.  Similarly, because we have previously held that the prosecutor's comments in this case did not constitute fundamental error, even though some of the prosecutor's comments in this case were ill-advised, they were not so prejudicial as to vitiate the entire trial.  Thus, Chandler is not entitled to relief on this claim.

*Chandler II*, 848 So. 2d at 1044-1046 (footnotes omitted) (emphasis added).

Closing argument is intended to "assist the jury in analyzing, evaluating and applying the evidence."  *United States v. Pearson*, 746 F.2d 787, 796 (11th Cir. 1984).  Thus, the prosecutor is not limited to a bare recitation of the facts; he may "comment" on the evidence, *id.* at 796, and may "state his contention as to the conclusions the jury should draw from the evidence." *United States v. Johns*, 734 F.2d 657, 663 (11th Cir. 1984).

Chandler asserts that the prosecutor's comment "[t]hink about all the things he wouldn't talk about and didn't say" was an improper comment on Chandler's invocation of his Fifth Amendment rights. As set forth *supra*, the Florida Supreme Court disagreed with Chandler's narrow interpretation of the comment, finding that because Chandler testified, the prosecutor was entitled to comment on the reasonableness or unreasonableness of his statements and any discrepancies in his testimony. *Chandler II,* 848 So.2d at 1044. Chandler's reliance on *Griffin v. California* to support his assertion that this comment was

improper is unavailing since Chandler, unlike Griffin, did testify in his own behalf. 380 U.S. 609 (1965) (holding that a prosecutor's direct reference to a criminal defendant's failure to testify is a violation of the defendant's Fifth Amendment privilege against compelled self-incrimination).

Chandler's interpretation of the prosecutor's remark as a criticism of his invocation of the Fifth Amendment privilege against self-incrimination is not necessarily the most natural one – which may explain why Zinober failed to object at the time. Having made the comment, the prosecutor then referenced specific instances where Chandler's testimony was contradicted by the testimony by another witness (Dkt. 19, App. A, Vol. 101 at 2618-20). For example, Chandler testified that on the night the murders occurred he was alone on his boat fishing, and when he attempted to return to the dock, he discovered that the boat would not start because the fuel tank was empty. According to Chandler, a hose in the fuel system burst, spilling all of his fuel. A certified boat mechanic testified, however, that he had examined the boat and found that Chandler's fuel line was possibly original equipment, was in good shape, and showed no signs of repair. According to the expert, even if there had been a hole in the fuel line, it would not have leaked fuel because of the anti-syphoning valve.

The prosecutor also reminded the jury that Chandler testified that a Coast Guard crewmember on a passing inflatable boat, referred to as a Zodiac, told him that they would come back to assist him after completing a check of an area of the shoreline, yet according to testimony by the individual in charge of Coast Guard operations in Tampa Bay on that day, the Coast Guard had only one "Zodiac" authorized to patrol the area, and that boat was not taken out into the water at all on the day in question (Dkt. 19, App. A, Vol. 99 at 2347-51). A customs patrol officer testified that while working as a confidential informant

for the United States Customs Service, Chandler repeatedly attempted to get information from him regarding the investigation of the Rogers murders (Dkt. 19, App. A, Vol. 99 at 2378-84).  The prosecutor commented on Chandler's testimony that he did not remember having ever asked the customs patrol officer any questions of this nature.

This Court finds that the prosecutor's comments during closing argument regarding inconsistencies in the evidence did not burden Chandler's exercise of his constitutional rights or violate due process.  While prosecutors must guard against remarks that could unduly burden a defendant's exercise of constitutional rights, courts must evaluate prosecutorial remarks within the specific context within which they arise, and not presume that a prosecutor intends – or that a jury will comprehend – an oblique but inappropriate interpretation, rather than a more direct, lawful one.  *See DeChristoforo*, 416 U.S. at 647 ("[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.").  In the instant case, the prosecutor's comment's were directed toward challenging Chandler's credibility as a witness.  *See Portuondo v. Agard*, 529 U.S. 61 (2000) ("In contrast to the comments in *Griffin,* which suggested that a defendant's silence is "evidence of guilt," *ibid.,* the prosecutor's comments in this case concerned respondent's credibility as a witness.  They were therefore in accord with the Court's longstanding rule that when a defendant takes the stand, his credibility may be assailed like that of any other witness--a rule that serves the trial's truth-seeking function.").  Counsel is simply not ineffective for failing to interpose an objection for which there is no basis.

Chandler also fails to rebut by clear and convincing evidence the Florida Supreme Court's determination that the prosecutor's comments that the theory advanced by the

defense was "legally or factually inaccurate or logically inconsistent" were proper.  He fails to cite any decision by the United States Supreme Court holding that a prosecutor cannot comment on the evidence during closing argument.

As to the last two assertions Chandler makes regarding the prosecutor's comments during closing argument, Zinober testified during the Rule 3.850 evidentiary hearing that he made a strategic decision not to object to the prosecutor's comments. The Florida Supreme Court agreed with the trial court that Chandler failed to demonstrate that Zinober's performance was deficient, recognizing that "in some circumstances a decision not to object to an otherwise objectionable comment may be made for strategic reasons." *Chandler II* at 1045. Chandler fails to cite any decision by the United States Supreme Court to the contrary.

A review of the state courts' decisions reveals that both the trial court and the Florida Supreme Court correctly applied the standard for ineffective assistance of counsel, as enunciated by the United States Supreme Court in *Strickland v. Washington*.  *Chandler II*, 848 So.2d at 1044-45; Dkt. 19, App. C, Vol. 11 at  2055-56).

Chandler asserts that the decision rejecting this claim is an unreasonable application of clearly established law, arguing that the Florida Supreme Court equated Florida's fundamental error standard applicable to the review of claims not preserved during the trial by a contemporaneous objection[8] with *Strickland*'s prejudice standard for ineffective assistance of counsel claims (Dkt. 16 at 43).  This Court rejects this constrained reading of the state court's decision. Moreover, both Respondent and post-conviction counsel

---

[8]A failure to object at trial is forgiven when the error is fundamental under Florida law.  *See Clark v. State*, 363 So.2d 331, 333 (Fla. 1978) ("'Fundamental error,' which can be considered on appeal without objection in the lower court, is error which goes to the foundation of the case or goes to the merits of the cause of action").  *See Parker v. Sec'y for Dep't of Corr.,* 331 F.3d 764, 774 n.6 (11th Cir. 2003) (recognizing this aspect of Florida law).

overlook the obvious: if trial counsel's performance is not deficient, it is axiomatic that the defendant cannot have been prejudiced thereby.  As discussed *supra*, to prevail on an ineffective assistance of counsel claim a petitioner must meet <u>both</u> prongs of the *Strickland* test.  *Strickland*, 466 U.S. at 697.  *See also Sims v. Singletary*, 155 F.3d 1297, 1305 (1998) (citing *Oats v. Singletary*, 141 F.3d 1018, 1023 (11th Cir. 1998)); *Darden v. Wainwright*, 477 U.S. at 184 ("First, petitioner must show that 'counsel's representation fell below an objective standard of reasonableness.'") (citing *Strickland v. Washington*, 466 U.S. at 668).

Chandler has failed to show that Zinober's strategy to forego objections to the prosecutor's comments during closing argument was unreasonable under prevailing professional norms. *Strickland*, 466 U.S. at 688. As in *Spaziano v. Singletary*, 36 F.3d 1028 (11th Cir. 1994), "[t]here is nothing in the record to indicate that [Chandler's] present counsel are either more experienced or wiser than his trial counsel, but even if they were, the fact that they would have pursued a different strategy is not enough." If the best lawyers or even most good lawyers would have interposed an objection to the prosecutor's comments during closing argument, it does not mean that Zinober's performance fell outside the wide range of reasonably effective assistance. *Id.* at 1040, 1041. Chandler fails to demonstrate that the state courts' finding that he failed to satisfy the deficiency prong is contrary to or an unreasonable application of the *Strickland* test.  Whether an appellate court on direct appeal would ordinarily reverse a conviction under these circumstances in order to deter prosecutorial misbehavior in general and assure a fair or fairer trial is not the issue. *Donnelly v. DeChristoforo*, 416 U.S. at 642-43.

Post-conviction counsel argues that the state courts' decision that Zinober's "failure to object to every improper comment made by the prosecutor was a strategic decision" is "an unreasonable determination of facts" (Dkt. 16 at 45).  Specifically, without citing any

case law in support of his argument, post-conviction counsel urges that this Court "should not accept [Zinober's] explanation that he had worked hard to establish good rapport with the jury and felt that the prosecutor was only hurting his case by attacking him and his client personally. . . . If [Zinober], in fact, had been able to establish a feeling of confidence in his and Chandler's credibility (as counsel claims in order to excuse his failure to object), the prosecutor certainly destroyed that during closing argument.  At some point in time, the failure of defense counsel to stand up to the state and protect the client from being berated by the prosecution can no longer be justified and sanitized as reasonable, objective strategy" (Dkt. 16 at 45).  This argument is wholly inadequate to support granting a writ of habeas.

The Court agrees with the state courts that Zinober's strategy to refrain from objecting to the prosecutor's comments was not deficient performance under *Strickland*. Chandler has not shown that this decision was an unreasonable determination of the facts, or an unreasonable application of the law to the facts, or that the application of the law was contrary to United States Supreme Court precedent. Additionally, Chandler has failed to meet the burden of overcoming all state court factual findings by clear and convincing evidence. *See* 28 U.S.C. §2254(e). Accordingly, this claim likewise lacks merit.

### Cumulative Error

Finally, Chandler asserts that when considered cumulatively, Zinober's errors rendered the trial fundamentally unfair (Dkt. 16 at 47). Because Chandler has failed to establish that the violations he alleges were indeed errors, they cannot support a cumulative error claim. *See United States v. Murray*, 2005 WL 3046549, *4 (11th Cir. Sept. 27, 2005). Arguments inadequate individually are no more adequate collectively. Moreover, the Supreme Court has not held that distinct constitutional claims can be cumulated to

grant habeas relief. Thus, it cannot be said that the judgment of the Florida courts is contrary to any Supreme Court decision so as to warrant relief under the AEDPA.

### Conclusion

For the foregoing reasons, the Court finds that Chandler has failed to establish that he is entitled to federal habeas relief.

ACCORDINGLY, the Court **ORDERS** that:

1.   The Petition for Writ of Habeas Corpus is **DENIED**.  Dkt. 1.

2.   The **Clerk** shall enter judgment against Chandler, terminate all pending motions, and close this case.

**DONE** and **ORDERED** in Tampa, Florida on February 8, 2006.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

<u>Copies furnished to</u>:
All Parties/Counsel of Record

SA:jsh

-72-